458 P.2d 514

James W. ENYART, Petitioner,

v.

INDUSTRIAL COMMISSION of Arizona, Respondent,

H. H. Wasser, Respondent Employer,

State Compensation Fund, Respondent Carrier.

No. 1 CA–IC 241.

Court of Appeals of Arizona, Division 1.

Department A.

Sept. 15, 1969.

Rehearing Denied Oct. 14, 1969.

Review Denied Nov. 12, 1969.

Dushoff, Sacks & Corcoran, by Seymour Sacks and Stephen L. Weiss, Phoenix, for petitioner.

Robert D. Steckner, Acting Chief Counsel, by Donald L. Cross and William E. Smith, Phoenix, for respondent, Industrial Commission.

Robert K. Park, Chief Counsel, Phoenix, for respondent carrier, State Compensation Fund.

CAMERON, Judge.

This is a writ of certiorari to review the findings and award of the Industrial Commission of Arizona which held that the claim of the petitioner was non-compensable.

We are called upon to determine whether the findings and award of the Industrial Commission that there was no causal connection between the defendant's employment and the injury is reasonably supported by the evidence.

The facts necessary for a determination of this matter on appeal are as follows. Petitioner had worked for the respondent H. H. Wasser in Phoenix, Arizona, for some 10 years. He did general nursery and sales work and spent approximately 60% of his time at the nursery and about 40% traveling around the valley inspecting trees. This work brought him in contact with composting material at the nursery as well as the areas he examined throughout the valley. The composting material included manure and chemical fertilizer as well as peat moss. Mr. Wasser, his employer, testified that in 1966 they plowed 15 to 20 tons of manure in the soil at the nursery where petitioner worked.

On 10 March 1967, petitioner injured his chest while working at the nursery. Subsequently, he became seriously ill and the initial diagnosis of coccidioidomycosis (valley fever) and pneumonia was made by the attending physician. Based upon this diagnosis the Commission denied compensation. Treadway v. Industrial Commission, 69 Ariz. 301, 213 P.2d 373 (1950).

The petitioner remained ill and in May 1967 a laboratory report showed that he was suffering nocardiosis. Petitioner was attended by two doctors, Dr. John F. Westfall, M. D. and Dr. Howard M. Kravetz, M. D., a consultant, who agreed, in separate letters to the Commission, that the infection was caused by exposure at his place of employment.

At the request of the petitioner, hearings were held at which the two doctors testified. Dr. Westfall testified as follows:

"Q Doctor, do you have an opinion to a reasonable medical certainty as to what the cause of nocardiosis in this case is?

"A I felt the nocardiosis in the case of Mr. Enyart was secondary to expo-

sure occurring relative to his place of employment.

"Q I am not sure what you mean by the word 'secondary'. Would you explain that?

"A Well, the cause of."

And:

"Q And you have said, Doctor, I believe, that to a reasonable medical certainty you feel that the nocardiosis that Mr. Enyart contracted was caused by exposure at the place of his employment or the conditions of his employment, is that correct?

"A That is correct."

The consulting physician, Dr. Howard Kravetz, M. D., a specialist in internal medicine with extensive graduate training in "all fungus diseases that affect the lungs", also testified with regard to the causal relationship between the petitioner's illness and his employment. Dr. Kravetz was asked and answered:

"Q * * * Do you have an opinion to a reasonable medical certainty as to what the cause of nocardiosis in Mr. Enyart was?

"A Yes. As stated in my report initially and in my discussions with Dr. Westfall during the course of the case, this man's occupation as a worker in a citrus area was the most likely because of his coming in contact with the nocardia asteroides.

"Q 'Reasonable medical certainty' is not a medical term, is it?

"A No, it is not.

"Q What do you mean when you say reasonable medical certainty?

"A Taking all of the evidence historically from the patient, his laboratory data, X rays, his physical examination, and then I arrive at a firm opinion as to a diagnosis, again taking into consideration other diagnoses that could cause the same group of symptoms, however, saying that this particular group of symp-

toms fit one disease. This is the working diagnosis that we go on, and again it is a firm one.

"Q Is it certain in the sense of being 100 percent certain without any qualification?

"A No, there is no such thing as 100 percent medicine.

"Q Is that particularly so in infectious diseases?

"A Very much so."

Two other expert witnesses testified, both of whom held Doctor of Philosophy degrees in microbiology. The first, Dr. William T. Northay, an Associate Professor in Microbiology at Arizona State University, testified on behalf of petitioner. Dr. Northay had done extensive research including atmospheric surveys in the Phoenix area to determine what fungus spores one might expect to find in this area. Regarding his survey he was asked:

"Q Did you find any nocardia asteroides in the atmosphere?

"A No."

And also:

"Q I have discussed with you previously the fact that the County Board of Health took certain soil samples from the area in which Mr. Enyart lived, have I not?

"A Yes.

"Q And I have discussed with you previously the fact that they found no nocardia asteroides as a result of the samples they took in September of 1967, which they analyzed in September of 1967 or early in January of 1968. What significance is there in their finding of no nocardia asteroides in that period of time when you consider the possibility of finding them back in April, March, or May of 1967?

"A Well, I think the fact that you don't find this organism in the soil does not necessarily mean that it is not there, because the techniques in-

volved are complex. The chances are that these organisms, living in what we call a micro-environment are likely to be there over a long period of time unless there had been some very vast changes in that soil for any particular reason, but this is unlikely.

"Q Are they more likely to be found in areas where there is composting material?

"A Yes.

"Q Why is that?

"A Well, the organism nocardia asteroides is an organism which competes better at higher temperatures. In a compost pile the temperature, because of bacterial fermentation, reaches a higher temperature. This then inhibits other organisms and gives nocardia asteroides a fighting chance, in other words."

And:

"Q I have given you certain facts that we have assumed about the Claimant in this case, James Enyart. Do you have an opinion as to the cause of etiology of this disease of nocardiosis, which we assume he has contracted?

"A Yes, I am quite convinced that he got this as a direct consequence of his occupation."

Dr. Jon M. Counts, Ph. D., Assistant Director of the Division of Laboratories for the Arizona State Health Department, testified for the Commission. Dr. Counts testified they were unable to isolate nocardia asteroides in the 12 soil samples taken from a 20 by 30 foot area at the nursery and submitted to them by the sanitarian who took the samples. On direct examination he was asked and answered:

"Q Are there other sources of the organism?

"A Present data shows that at least they are present in the soil. They could be present elsewhere, but most of the research has been done on the soil.

"Q Are there any other known sources of this kind which you know of?

"A Not that I know of."

On cross-examination Dr. Counts testified as follows:

"Q Let us assume for the minute this man did nothing but stay in this area of the nursery. If I told you that the area was a little over an acre, we can agree that an acre is about 44,000 square feet, and all of these soil samples were taken in a 20 x 30 square foot area, which is 600 square feet. Would you think that would be a representative sample of that area?

"A Normally—again for statistical purposes—we at least try to get at least a 10 percent representations (sic) statistically of soil or something like that.

"Q Not to argue with you, because you didn't say where to do it, but 600 square feet is not nearly 10 percent of 44,000 square feet; in fact, it is not 5 percent; in fact, it is one-third of 5 percent, or a percent and a half by my rough mathematics, not modern math, is that right?

"A Without calculating it, I would say that is approximate."

Also:

"Q You did say, I believe—and correct me if I am wrong—that the presence or absence of nocardia asteroides in the Wasser Nursery in November or December of 1967 would have no bearing as to whether they were present or absent in the spring of 1967?

"A It is possible they were there."

The referee issued a report recommending the Commission accept the claim as compensable. The Commission, however, issued the award complained of on 23 October 1968, reaffirming its previous decision of noncompensability, which in effect found that applicant did not sustain an accident

arising out of and in the course of his employment.

■ Our Supreme Court has recently restated that it is the burden of the applicant to show affirmatively all of the material elements necessary to sustain an award. Bedwell v. Industrial Commission, 104 Ariz. 443, 454 P.2d 985 (1969). In order to set aside an award denying compensation it must appear that the evidence was such that, as a matter of law, the award of the Commission cannot be sustained because there is no reasonable evidence upon which the Commission could have reached its conclusion, and we must set aside the Commission's findings where there is no evidence to support the award. Sheridan v. Industrial Commission, 84 Ariz. 264, 327 P.2d 90 (1958), Rahar v. Industrial Commission, 94 Ariz. 170, 382 P.2d 656 (1963), Thiel v. Industrial Commission, 1 Ariz.App. 445, 404 P.2d 711 (1965). Neither we nor the Commission can totally disregard the only medical evidence presented in arriving at an award or reviewing the same. Mead v. American Smelting, 90 Ariz. 32, 363 P.2d 930 (1961), Murray v. Industrial Commission, 87 Ariz. 190, 349 P.2d 627 (1960). When medical opinion based on matters peculiarly within the realm of scientific knowledge are uncontroverted, as in the instant case, such opinion cannot be arbitrarily rejected by the Commission. Cameron v. Industrial Commission, 98 Ariz. 366, 405 P.2d 802 (1965).

The medical testimony here is uncontradicted that the disease was work-connected. The petitioner was employed as a nurseryman and in this capacity he came in daily contact with soil that had been enriched with composting materials and with composting materials themselves. The medical experts and the scientific experts agreed that the fungus which produces nocardiosis is found in the soil and primarily in composting materials. The record is replete with testimony that this is the only place that the petitioner came in contact with soil and composting materials. He testified that while he lived adjacent to the nursery

he was not a hobby gardener, and further testified that within the past three or four years he had had no other contact with soil and composting materials except through his employment.

The *Treadway* case, supra, cites at length and with approval from Andreason v. Industrial Commission, 98 Utah 551, 100 P.2d 202 (1940). It is our opinion that the *Andreason* case is more closely analogous to the instant case than is *Treadway,* supra. In *Treadway,* the petitioner was attempting to establish a causal relationship between his disease of valley fever and his employment in moving and handling tents that had been used by the Army and had been shipped from San Bernardino, California, to Arizona. It was the contention of the petitioner in that case that the tents carried the fungus which caused the disease. However, as that case points out, there was "not one scintilla of evidence" to show that the tents had been used in the San Jacquin Valley as the petitioner alleged, and further medical evidence showed that valley fever is endemic to Arizona, as well as to the San Jacquin Valley.

By contrast, the *Andreason* case dealt with "bacillus enteriditis", a disease which is acquired only from contact with diseased animals or diseased meat. Andreason's duties in his employment consisted of skinning and butchering animals bought for use in the manufacture of chicken feed and other animal by-products. The Utah court considered the state of the record in the *Andreason* case. They concluded that the inferences were strongly in favor of a finding that the disease was contracted at the petitioner's place of employment, and considering further, found that there was no picture of possible contacts outside of his employment to which one could point and say, he might have acquired it from that contact.

■ The Commission is insistent that the petitioner has failed to meet his burden of proof because the existence of nocardia asteroides at the nursery was not shown through tests of soil samples taken from a limited area and made many months after the petitioner contracted the disease.

We do not believe that the negative results of the tests made on the soil samples may be considered substantial controverting evidence upon which the Commission may base a denial of petitioner's claim for reasons of conflicting evidence. While presence of the fungus in the limited soil samples taken might be some evidence that the petitioner contracted the disease at that spot, the converse is not true and the meager samples are not sufficient material evidence from which the Commission could contend that the petitioner did not contract the disease in the course of his employment.

Our Supreme Court early discussed the competency of negative evidence of this type as follows:

"The competency of such testimony depends upon circumstances. This was very aptly illustrated by the learned judge of the lower court in this case. He said: 'If one said, "John Jones was not in New York, because, if he had been there, I would have seen him," the answer would be inadmissible; but if he had said, "He was not in a certain room in New York because I did not see him; I was there, and, if he had been there, I would have seen him"—that would be admissible.' " Bruchman v. United States, 11 Ariz. 178, 182, 183, 89 P. 413, 414 (1907).

Considering the circumstances under which the soil samples were taken, we do not believe the negative results are of any probative value in establishing the nonexistence of the nocardiosis fungus in the nursery yard.

A review of the large file in this matter, a reading of the testimony as the result of two days of hearings, indicates that there was no conflict in the medical evidence and that the award of the Commission is not reasonably supported by the evidence.

Award set aside.

DONOFRIO, P. J., and STEVENS, J., concur.