492 P.2d 1222

**Lily[1] May MOORE, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Western Sundown Motel Restaurant, Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. 1 CA–IC 546.**

Court of Appeals of Arizona, Division 1, Department A.

Jan. 24, 1972.

Rehearing Denied March 14, 1972.

Review Denied May 2, 1972.

1. Although the true spelling of the petitioner's first name is "Lillie" rather than "Lily", it has been carried as Lily in most of the proceedings.

Lindauer & Revis by William B. Revis and Mark H. Goldberg, Phoenix, for petitioner.

William C. Wahl, Jr., Chief Counsel, The Industrial Comm. of Ariz., Phoenix, for respondent.

Robert K. Park, Chief Counsel, State Compensation Fund by Cecil A. Edwards, Jr., Phoenix, for respondent carrier.

DONOFRIO, Judge.

This case is before the Court by writ of certiorari to review the lawfulness of an award and findings of The Industrial Commission of Arizona issued on August 10, 1970, denying a rehearing of its previous award of June 2, 1970, awarding petitioner temporary disability only. The petitioner suffered an injury to her left knee on September 25, 1962. She was then 45 years old, and worked as a motel maid. As a result of this injury she was subjected to four surgeries on her left knee which eventually resulted in the knee being fused and the kneecap removed.

This claim was also the subject of our opinion in Moore v. Industrial Commission, 12 Ariz.App. 325, 470 P.2d 473 (1970).

On June 2, 1969, the petitioner filed a petition to reopen. This was supported by a medical report from her attending physician stating that she was totally disabled as a result of the industrial accident. After denial of the petition, petitioner requested and was granted a hearing. The attending physician testified at the hearing that as a result of the accident and the subsequent surgeries petitioner suffered a greater disability than the 35% loss of function of the left leg previously awarded to her.

We will not burden this opinion with the involved medical history. The following testimony given at the January 21, 1970 hearing is pertinent. Robert Zane Collings, Jr., M.D., petitioner's attending physician, was asked and answered as follows:

"MR. GOREY: Counsel, this is the statement of May 14, '69. Do you have a copy of that. Now, Doctor, will you tell what was the physical occasion of your writing that letter?

"A In regards to the industrial injury Lily May Moore has; as a result of a removal of an internal medial meniscus a series of unfortunate events took place that resulted in an arthrodesis of her left knee joint, making it a fixed joint. After the treatment and after the joint was arthrodesed and the immediate postoperative surgical course had reached a level it was founded that she ended up with a stiff knee plus an inversion of her foot. Now, this abnormal posture of her foot plus the long series of infections and treatments that this knee occasioned she has had persistent swelling of this lower leg, dilatation of the veins due to the scar tissue that has set in impeding the circulation. On many occasions I have had to inject the veins to prevent their spontaneous bleeding. She also has an abnormal thrust as far as walking goes; being unable to do any bending, putting a stress on her hip and in her spine. And I think on past occasions the record will show that she does have a moderate amount of lumbosacral osteoarthritis. Now all these symptoms and results of this original operation for a simple removal of a medial meniscus—she is not gainfully employed. Although she has tried in her home to do various tasks even to the extent of baby sitting and being active. The casual observer can look at her leg right now and will notice the points that I have already made. This leg of hers is going to produce problems both now and in the future due to the extensive fibrosis that has occurred around the knee joint. This impedes the return of lymph flow as well as venous return. And then the abnormal position and the arthrodesed leg. *This will present problems to her both as regards to pain, and the necessity for treatment, and it will produce strain on the hip and in the low back, which I am sure Mrs. Moore will corroborate.* (emphasis ours)

"Q And, Doctor, now with reasonable medical probability can you tell us whether all or any part of these pathologies that you have now described are directly or indirectly the result of the original injury?

"A The removal of the medial meniscus is a very routine, very frequent operation that orthopedic surgeons perform constantly. Many of our football players, high school students and so forth have these operations. I'd say 99% of them result in removal of the displaced cartilage which in itself would produce further

arthritis and so on. And many of these men go back to work. Joe Namath has had both of these cartilages removed and he is still playing football, although he gets considerable pains in his knees. Apparently there is no—what shall I say—there has been no medical treatment in this case, but there has been an unfortunate series of events that this simple operation resulted in these post-operative complications necessitating a complete arthrodesis of the knee. This is the first one I have heard of in my whole years in medicine. And it has resulted in an inversion of the knee—of the foot. Now, of course, this was a solution to the problems that arose; in operating on this simple cartilage. It was an untoward event, which I am sure any physician would cry if he ever had to assume the responsibility and the care for a result that has turned out as we see here.

"MR. ROOF: Just a moment. I do not want to impede the flow of information, but I don't believe the answer was responsive. The original question having been a reasonable medical probability question.

"THE REFEREE: Well, it has been asked and answered. And the probative value will be my determination.

"MR. ROOF: Very well.

"THE REFEREE: Doctor, try to confine your answer to the question.

"A Let him hit me again.

"MR. GOREY: What counsel and the Hearing Officer are referring to is the question whether or not you might say in summary, we will say, in your opinion with a reasonable medical probability is there a causal relationship between all these things you have mentioned and the original injury?

"A *Yes, sir, there is a direct continuity in this whole thing as unfortunate as it may be.*" (emphasis ours)

The petitioner at the January 21, 1970 hearing furnished the corroboration mentioned in Dr. Collings's answer, supra. She was most emphatic that she was worse, suffered intense pain, and as far as medicine and doctors' bills are concerned she had been paying many hundreds of dollars' worth. One of her answers was, "The knee just makes me fall down. And my hip swells up and I can't walk good. And I have so much pain I can't hardly stand it."

We view the evidence in the light of the recent pronouncements of our Supreme Court. In a very recent case it stated:

"Whether the testimony of a medical expert is substantial for the purpose of creating a conflict with the testimony of the examining physician must be determined on an individual basis, depending upon the patient, the nature of the injury, and the nature and extent of the testimony itself." Condon v. Industrial Commission, 108 Ariz. 65, 492 P.2d 1172 (Filed January 14, 1972).

See also Pais v. Industrial Commission, 108 Ariz. 68, 492 P.2d 1175 (Filed January 14, 1972); Rutledge v. Industrial Commission, 108 Ariz. 61, 492 P.2d 1168 (Filed January 14, 1972).

Dr. Thomas Taber testified at a subsequent hearing, and a detailed examination of the medical facts and opinions accumulated in the five-part file reveals that Dr. Taber's opinion, if it in any way created a conflict in medical evidence, was based on a misapprehension or an omission of important medical facts. The same is true of the doctor's written report of the examination of petitioner on February 13, 1970.

As an example, Dr. Taber's written report of his orthopedic examination of the petitioner on February 13, 1970, which was subsequent to the aforementioned testimony of Dr. Collings and petitioner, fails to mention that in addition to petitioner's fused knee she was left with her foot internally rotated approximately thirty degrees. This latter fact is contained in the consultation report of December 1, 1965, which was signed by Dr. Taber, Dr. K. L. Huffman and Dr. R. L. Morgan.

Upon examination of the petitioner's contention that the stiff knee combined with the thirty degree internal rotation of her left foot places strain and stress on her back, causing her pain and symptoms in that area, we enter the field where the law of Arizona states that where the claimed disability cannot be seen or known by a layman, it can be established only by expert medical testimony. Romero v. Industrial Commission, 11 Ariz.App. 5, 461 P.2d 181 (1969); Altamirano v. Industrial Commission, 12 Ariz. App. 345, 470 P.2d 493 (1970). The converse of this is equally true. It takes little imagination for a layman to realize that attempting to walk with a completely fused left knee, and a foot that is internally rotated thirty degrees, is going to cause abnormal stress upon other parts of the body, especially in view of the facts of this case.

■ In order to set aside an award denying compensation, it must appear that the evidence was such that, as a matter of law, the award of the Commission cannot be sustained because there is no reasonable evidence upon which the Commission could have reached its conclusion. Enyart v. Industrial Commission, 10 Ariz.App. 310, 458 P.2d 514 (1969).

■ In the instant case, we hold that there is no reasonable medical evidence upon which the award of the Commission could be based. The petitioner suffers from varicose veins superimposed upon her fused knee which were aggravated by her industrial injury. In addition to this, the industrial injury and the surgeries which were performed upon her have left her with a grossly deformed left leg which is obviously causing her problems and symptoms in the hip and back area. The record reflects that petitioner's condition is no longer a scheduled injury but that she has residual disabilities of an unscheduled category. Petitioner is entitled to further accident benefits and compensation.

The award is set aside.

STEVENS, P. J., and CASE, J., concur.