535 P.2d 1053

**GLOBE INDEMNITY COMPANY, and Arizona Sand and Rock Company, Petitioners,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Thomas Nance, Respondent Employee.**

**No. I CA–IC 1092.**

Court of Appeals of Arizona,
Division 1,
Department C.

May 13, 1975.

Glen D. Webster, Jr., Phoenix, for petitioners.

Edward F. Cummerford, Chief Counsel, The Industrial Commission of Ariz., Phoenix, for respondent.

Gorey & Ely by Herbert L. Ely, Phoenix, for respondent employee.

## OPINION

WREN, Judge.

This review by certiorari questions the lawfulness of an award by the Industrial Commission of Arizona, finding that respondent had a compensable claim for silicosis. Specifically, three questions are presented: (1) was respondent exposed to silicon dioxide dust in his work for the petitioner employer; (2) was that work the proximate cause of respondent's contraction of silicosis; (3) was respondent required to show that his silicosis disabled him from all work or just from returning to his former employment.

Our resolution of the third issue pertaining to total disability necessitates the setting aside of the Commission award and is accordingly, dispositive of this appeal. Though mindful of the fact that this Court does not have the authority to affirm in part and reverse in part, we will discuss the other issues presented, solely for purpose of offering the Commission some guidelines for the future disposition of this case.

Respondent, Thomas Nance (Nance), had worked for various employers in the rock and gravel industry in Arizona from 1941 to 1963. His work throughout this period involved rock crushing operations bringing him exposure to dust from the materials crushed.

From 1963 to 1973, Nance worked for the petitioner, Arizona Sand and Rock Company (Arizona Sand). He operated Arizona Sand's wet plant until 1965, and thereafter took over the operation of its dry plant, where he remained until leaving its employ in 1973. His job at the dry plant had been to supervise the rock crushing operation from a glass-enclosed, air-conditioned booth, on top of a tower approximately fifty to seventy feet high. The actual crushing of the rock took place in tanks directly below the tower where Nance worked. It is uncontroverted that this rock crushing operation produced a certain amount of dust. The critical issues are whether the dust permeated into the booth where he worked, and if so, whether it caused his silicosis.

In 1971, Nance was examined by Dr. Austin Grant, a specialist in thoracic and chest surgery. According to the doctor, Nance complained of a persistent cough, slight

shortness of breath and some fatigue. On Dr. Grant's recommendation, Nance was hospitalized and a bronchoscopy performed for the purpose of making a diagnosis as to his condition. The findings were inconclusive, and Dr. Grant recommended that a lung biopsy be performed. Nance did not initially consent to the additional surgery. Instead, he returned to work and continued working until January of 1973 when, because of increasing severity of his symptoms, he quit his job. He was again hospitalized the same month and a lung biopsy was performed, following which a diagnosis was made that he was suffering from silicosis and kansaii. Nance had not worked since leaving his employment with Arizona Sand.

Nance's claim for benefits under the Arizona Occupational Disease Disability Act was denied by the petitioner insurance carrier. In protest thereof, hearings were held in July and September of 1973, and an award was entered in September of 1973, finding that he had a compensable claim for silicosis and that the carrier was liable for benefits provided for under the Act. The award was affirmed by the Commission on review, and petitioners thereafter filed their petition for writ of certiorari with this Court.

Under the Occupational Disease Disability Act, A.R.S. § 23–1101 et seq.,[1] bene-fits are provided for workmen who become afflicted with diseases caused by conditions which are normal and constantly present and characteristic of their particular occupations. In re Mitchell, 61 Ariz. 436, 150 P.2d 355 (1944). Silicosis is one such disease. For it to be compensable, the following elements must be established by a claimant:

> That he has silicosis as defined by A.R.S. § 23–1102(10);[2]

> Proximate causation, as defined in A.R.S. § 23–1103, between the disease and his employment;[3]

> Total disability resulted within two years from the last day upon which he actually worked for the employer against whom compensation is claimed. A.R.S. § 23–1107(A)(3)

In addition to the foregoing requirements, the following limitation on an employer's liability is recognized:

> "[T]he only employer liable shall be the employer in whose employment the employee was last exposed to harmful quantities of silicon dioxide . . . dust during a period of sixty days or more." A.R.S. § 23–1105

As to the claimant's burden of proof in establishing exposure to "harmful quan-

---

1. This case was decided under the provisions of the Occupational Disease Disability Act as amended in 1971. Subsequent thereto, the Act was repealed in 1973. *See* Laws 1973, Ch. 53, § 4.

2. A.R.S. § 23–1102(10) provides:

   "Silicosis. For the purposes of this chapter, silicosis means a chronic disease of the lungs caused by the prolonged inhalation of silicon dioxide dust characterized by small discrete nodules of fibrous tissue similarly disseminated in both lungs, causing characteristic X-ray pattern, and by variable clinical manifestations."

3. A.R.S. § 23–1103 provides:

   "The occupational diseases defined by § 23–1102 shall be deemed to arise out of the employment only if:

1. There is a direct causal connection between the conditions under which the work is performed and the occupational disease.

2. The disease can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment.

3. The disease can be fairly traced to the employment as the proximate cause.

4. The disease does not come from a hazard to which workmen would have been equally exposed outside of the employment.

5. The disease is incidental to the character of the business and not independent of the relation of employer and employee.

6. The disease after its contraction appears to have had its origin in a risk connected with the employment, and to have flowed from that source as a natural consequence, although it need not have been foreseen or expected."

tities" of silicon dioxide dust, the following statutory presumption is provided:

"Proof of the exposure to silicon dioxide dust . . . for a period of not less than one thousand two hundred work shifts in employment in this state, with proof of total disability from silicosis . . . shall be prima facie evidence of exposure to harmful quantities of such dust during all of such period." A.R.S. § 23-1107(C)

The consensus of opinion from the physicians testifying before the Commission reflects that silicon dioxide dust is in essence "rock dust". The record shows no dispute as to this proposition. Moreover, there is no argument with the fact that Nance had contracted silicosis within the meaning of A.R.S. § 23-1102(10). *See* note 2, *supra*. The precise question is whether he contracted the disease from his work with Arizona Sand. To that point petitioners assert that there is no evidence showing that Nance was exposed to silicon dioxide dust in his work environment. They liken the situation here to that in Utah Const. Co. v. Berg, 68 Ariz. 285, 205 P.2d 367 (1949). In *Berg,* the court held that evidence that a workman had worked in "dusty trades" was insufficient to invoke the statutory presumption of exposure to "harmful quantities" of silicon dioxide dust, where it was not shown that the dust the workman was exposed to was silicon dioxide dust. *Accord,* Inspiration Consol. Copper Co. v. Industrial Commission, 85 Ariz. 204, 335 P.2d 416 (1959).

Initially, we note that the Industrial Commission is presumed to have considered all relevant evidence in making an award. Scott v. Industrial Commission, 11 Ariz.App. 20, 461 P.2d 499 (1969). On review, the appellate court does not weigh the evidence but considers it in a light most favorable to sustaining the findings and award of the Commission. Malinski v. Industrial Commission, 103 Ariz. 213, 439 P.2d 485 (1968). If reasonably supported by the evidence they will be sustained. Spears v. Industrial Commission, 20 Ariz. App. 406, 513 P.2d 695 (1973).

Nance testified that dust from the rock crushers below the tower would come into the booth through cracks, approximately one-half inch to three-quarters of an inch wide, around the door and air conditioning unit. He stated that he could see this dust practically all the time and that it would continuously float up from the crushers when the wind was still. In addition, he related that it would be blown into the booth if the wind was coming from the direction of the conveyors, which carried dry rock to and from the crushers. According to his testimony, he would have to take a broom, sometimes every day, and sweep the dust off the glass inside the booth. He added that when it got hot inside the booth, he would leave the door open, and that he often stayed on a platform outside the booth.

Controverting testimony came from Jack Ailes, production manager of the dry plant, who stated that on occasions when he had observed the tower, he had not seen any dust from the rock crushers surrounding the booth. He further stated that on the five or ten occasions he went up to the booth during the time Nance worked there, he had never seen any dust particles in the air or on the glass.

Dr. Eugene Ryan, a specialist in occupational medicine, and Arizona Sand's medical consultant, expressed his familiarity with petitioner's rock crushing operation and the tower where Nance worked. Asked at what level silicon dioxide dust particles from the rock crushers would rise to, he responded by saying he would suspect it to have a ten to fifteen foot height.

In our opinion, the uncontroverted fact that the rock crushing operation below the tower produced silicon dioxide dust and Nance's testimony that he could see the dust coming into the booth is competent evidence to support a conclusion that silicon dioxide dust was present in the booth where he worked.

Petitioners additionally assert that Nance did not meet his burden of proof in showing that his work was the proximate cause of his silicosis. In particular, petitioners

rely on the results of a test performed by James Matt, a Dust Engineer for the State Mine Inspector's Office. In July of 1973, Matt conducted a test lasting approximately ten minutes, to determine the dust concentration inside the booth where Nance worked. He found it to contain one and a half million particles per cubic foot of air. According to Matt, the maximum safety limit is ten million particles per cubic foot.[4]

Based on Matt's test results, hypothetical questions were posed to Drs. Ryan and Westfall, and also Dr. Bertram Snyder, a specialist in internal medicine and chest diseases, as to the possibility of contracting silicosis. Dr. Ryan stated that that amount of dust would not have caused silicosis. Dr. Westfall stated that if that was the concentration, Nance probably developed silicosis before the time he started working for Arizona Sand. Similarly, Dr. Snyder stated that it would be rather difficult to get silicosis at that level.

The probative value of a test used under circumstances similar to this case, was considered in Enyart v. Industrial Commission, 10 Ariz.App. 310, 458 P.2d 514 (1969). In *Enyart,* a sampling was made of a claimant's work environment to determine whether it contained elements which allegedly caused a disease contracted by him. The court in *Enyart* held that the negative results of the test had no probative value in establishing the non-existence of these elements, where the sampling was made several months after the workman contracted the disease, and was taken of only a small portion of the area in which he had worked.

▉ Necessarily, the probative value of such a test must depend on whether the conditions and circumstances under which it is made, are identical or similar to the situation in question. *See* Enyart, *supra;*

McCormick on Evidence § 202 (1972). We do not believe the result of Matt's test reflects the continual condition of the environment in the booth over the years Nance worked there, particularly in light of Nance's testimony as to varying degrees of dust intensity, depending upon wind conditions. In addition, the probative value of Matt's test was virtually destroyed by the testimony of Joe Collier, a toxicologist for the City of Phoenix, who stated that Matt's test results had no scientific basis. He explained that the indicator ten million particles per cubic foot assumes the material is only twenty-five percent silica. According to Collier, in a rock crushing operation where the dust is primarily silica, a one and a half million particle per cubic foot figure would not truly indicate the actual level of harmful dust. In addition, Collier stated that at a ten million particle per cubic foot level, the dust would not be visible. Therefore, assuming the truth of Nance's testimony that he could see dust, according to Collier, the dust concentration level would be ten to twenty times greater than the safety limit level.

Dr. Westfall confirmed that the amount of dust Nance claimed he was exposed to would cause silicosis. The doctor explained that intermittent exposure to dust at a level of ten million particles per cubic foot over the years Nance worked in the tower would probably cause silicosis.

Nance testified that he had not come into contact with places or activities outside of his work which exposed him to dust. He further testified that even though he was exposed to dust during the many years prior to his employ by Arizona Sand, he had never been exposed so directly and continuously as while working in the tower. He explained that in his prior jobs, he had generally been free to leave the area he was working in if the dust got too bad.

---

4. At the time this case was decided, A.R.S. § 27–411(2) had been amended, effective May of 1973. Prior to this amendment, subsection (2) defined "hazardous dust condition" as the existence of dust in excess of ten million particles per cubic foot of air. Amend- ed subsection (2) deleted the specification of a particular dust level as hazardous, and defined hazardous as that level of dust in excess of the limit specified by the state mine inspector in the rules and regulations.

In addition, Nance stated that it was not until 1968, while working for Arizona Sand, that he first began feeling ill when he started to "hack a little and cough." These symptoms which became progressively worse, were described by Dr. Westfall as consistent with silicosis. Also, immediately prior to taking over the operation of the dry plant in 1965, Nance was given a physical examination by Dr. Ryan. No evidence of silicosis was found. Dr. Ryan did state however, that he could nevertheless have had silicosis at that time. He pointed out, as did Drs. Westfall and Snyder, that silicosis is an insidious disease, and that when contracted, its progression is irreversible. According to Dr. Ryan, a person could have silicosis and be asymptomatic from twelve to as many as thirty years, and that a physical examination during this period probably would not reveal it.

In our opinion, regardless of the inconclusiveness of the physical examination in 1965, the evidence reasonably supports the Commission's finding that Nance's work in the tower was the proximate cause of his contraction of silicosis.

As to the third issue raised by petitioners, by an amendment, effective in August of 1971, A.R.S. § 23–1101 was rewritten and subsection (5) defining a total disability was deleted. *See* Laws 1971, Ch. 173, § 22. However, the requirement of A.R.S. § 23–1107B(3) that total disability be established still remained. The question presented therefore is the meaning of the deletion of subsection (5) which defined total disability as follows:

> " 'Disablement' means physical incapacity by reason of an occupational disease, as defined in this chapter, to perform any work for remuneration or profit. 'Silicosis' or 'asbestosis' as defined in this chapter, when complicated by active pulmonary tuberculosis, shall be presumed to be total disablement. 'Disability', 'disabled', 'total disability' or 'totally disabled' shall be synonymous with 'disablement'."

The hearing officer found that the deletion of subsection (5) meant that a workman was no longer required to be totally disabled from any and all kinds of work for profit, but that it would be sufficient if he was totally disabled from returning only to his former employment.

We do not agree with the hearing officer's finding. In our opinion, as a result of subsection (5) being repealed, the term "total disability" was given the same meaning under the Occupational Disease Disability Act as it has under the Workmen's Compensation Act. This conclusion is supported by the repeal of the Occupational Disease Disability Act in 1973 and the incorporation of occupational diseases into the Workmen's Compensation Act.

Accordingly, inability to return to one's former employment does not conclusively establish total disability. It is the workman's earning power in the open labor market, and not his ability to do a certain type or class of work which is the measure of his disability. Western Union Telegraph Co. v. Industrial Commission, 13 Ariz.App. 189, 475 P.2d 281 (1970); Edwards v. Industrial Commission, 3 Ariz.App. 290, 413 P.2d 800 (1966). In Savich v. Industrial Commission, 39 Ariz. 266, 270, 5 P.2d 779, 780 (1931), the court stated as follows:

> "The word 'disability,' as used in our Compensation Act does not mean disablement to perform the particular work [the workman] was doing at the time of his injury, but refers to injuries which result in impairment of earning power generally."

However, the fact that the workman has the ability to earn some money or perform certain kinds of work does not preclude a finding of total disability. In Phelps Dodge Corp., Morenci Br. v. Industrial Commission, 90 Ariz. 379, 383, 368 P. 2d 450, 453–454 (1962), the court quoted from 2 Larson, Workmen's Compensation Law § 57.51 as follows:

> " 'An employee who is so injured that he can perform no services other than

those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled.' "

At the time of the Commission hearing, Nance was sixty-two years old. As previously indicated, he had not worked since leaving Arizona Sand's employ; however, the record additionally reflects that petitioner had not sought any work because of his condition. His problems essentially were severe shortness of breath and periods of uncontrollable coughing. Both Drs. Westfall and Grant related petitioner's present condition to silicosis, while Dr. Snyder related it to the kansaii. Other than Dr. Snyder's testimony that the kansaii did not preclude Nance from doing sedentary work, there is little enlightenment in the record as to any impairment resulting from that disease.

As to the silicosis, Dr. Westfall testified that though the condition may improve, silicosis tends to be a progressive disease, causing the impairment to worsen as time goes on. Dr. Westfall stated that Nance was disabled from returning to his former employment, since any additional exposure to rock dust could produce additional changes in his lungs. He described Nance's primary impairment as shortness of breath, and advised him against doing any prolonged walking or lifting. Asked if Nance was a "basket case", Dr. Westfall replied that he was not—that he could drive a car, or sit and work for a while.

Controverting testimony came from Dr. Grant, who last saw Nance in February of 1973. The doctor stated that as of the last time he saw him, Nance could not be gainfully employed since his silicosis was far advanced, involving both lungs.

As previously stated, the hearing officer applied an incorrect test in his determination of total disability. Though the record reflects that this erroneous determination did not prejudice the rights of petitioners in adducing evidence on this issue, the record does not compel the conclusion that the only result that could have been reached by the hearing officer was that petitioner was totally disabled from doing any type of work. There was evidence to support a contra conclusion and accordingly, the award must be set aside.

NELSON, P. J., and STEVENS, J., concur.