335 P.2d 416

INSPIRATION CONSOLIDATED COPPER COMPANY, a corporation, Petitioner,

v.

INDUSTRIAL COMMISSION OF ARIZONA and Benjamin Rocha, Respondents.

No. 6658.

Supreme Court of Arizona.

Feb. 11, 1959.

James D. Lester, Phoenix, for respondent Industrial Commission of Arizona. John R. Franks, Donald J. Morgan, Robert K. Park, and Frances M. Long, Phoenix, of counsel.

H. S. McCluskey, Phoenix, for respondent Benjamin Rocha.

STRUCKMEYER, Justice.

This matter comes before this court on a writ of certiorari issued upon application of the employer, Inspiration Consolidated Copper Company, a corporation, to review an award by the Industrial Commission of Arizona of compensation and other benefits to Benjamin Rocha for total disability due to silicosis complicated by tuberculosis.

The evidence taken in the light most favorable to claimant shows that Rocha worked for various employers in the mining industry, primarily underground, in the State of Arizona from 1916 to 1924. From that time until 1935 he worked and held various jobs in the course of which he would not ordinarily have been exposed to the inhalation of harmful amounts of silicon dioxide dust. Sometime in 1935 he went to work for petitioner, the Inspiration Consolidated Copper Company, at Inspiration, Arizona, and continued in its employment until January 2, 1957, at which time he became totally disabled with silico-tuberculosis. All of Rocha's work for the Company was on a surface job in what is called the tank house of the electrolytic refinery.

Gust, Rosenfeld, Divelbess & Robinette, and G. H. Ladendorff, Phoenix, for petitioner.

In the process of refining copper the ore is taken from open-pit mines, the nearest of which is approximately one-half mile from the tank house. It is then crushed to a proper size and conveyed by belts to large open tanks known as leaching tanks. Thereafter, by chemical action, the copper content is leached from the ore and a solution containing the copper is transported by pipes to the tank house where by electrolysis the copper is removed from the solution and deposited on copper plates. No ore or rock of any kind comes into the tank house. The work there consists for the most part in putting starting sheets into the tanks and removing the sheets after the copper has been deposited upon them, loading the sheets into box cars for shipment to market, and general cleanup work.

Silicosis is generally defined as a disease cause by the inhalation of free silica, $SiO_2$, usually in the form of quartz. Doctor Reginald H. Smart, a witness in behalf of the Company, qualified as an expert on the subject of silicosis, having spent most of his adult life in the study and treatment of this condition, testified without contradiction that silicon dioxide and free silica are the same thing, and that those terms are used interchangeably. He also stated that silicon dioxide, $SiO_2$, is an allotropic substance; that is, while the chemical formula is the same, the substance exists in several different physical forms of which quartz is one; and that they are classified as free silica in contradistinction to silicates. Silicates are compounds of other elements with silicon.

In 1941, a routine X-ray of the claimant showed that he had silicosis which was described as first stage, possibly between the first and second stage. However, claimant was seemingly otherwise in good health and he continued to work. A series of x-ray examinations of claimant's chest in 1950 revealed early third-stage silicosis with probable superimposed tuberculosis infection. These examinations were made at the Miami Inspiration Hospital, a hospital maintained by several mining companies including the Inspiration Consolidated Copper Company. The 1950 X-ray record contains a notation that sputum and other diagnostic procedures were advised, but no record appears that this advice was ever carried out. No further examinations were made of claimant until January of 1957 when he developed severe dyspnea, at which time further X-ray examinations were made and acid-fast bacilli of Koch were determined to be present in claimant's sputum. This led to the ultimate diagnosis of silico-tuberculosis. By statute, A.R.S. § 23–1101, silicosis when complicated by active pulmonary tuberculosis is presumed to be totally disabling.

Claimant filed for compensation under the Arizona Occupational Disease Disability Act, A.R.S. § 23–1101 et seq., and after various examinations and the hearings, the Commission entered an award finding a non-compensable claim and denying compensa-

tion. Claimant duly applied for a rehearing which was granted, and upon this rehearing the Commission entered an award for compensation, finding that "during the last ten years of employment in the State of Arizona, said applicant was exposed to harmful quantities of silicon dioxide dust for a period of 1200 work shifts." The Company's petition for a rehearing was denied, and this review followed.

The pertinent portion of the applicable Arizona statute provides:

"No compensation shall be paid in case of silicosis or asbestosis unless during the ten years immediately preceding the disablement the injured employee has been exposed to harmful quantities of silicon dioxide dust or asbestos dust for a total period of not less than one thousand two hundred work shifts in employment in this state * * *." Subd. A, par. 3, A.R.S. § 23–1107.

The Company urges that the Commission's award is not reasonably supported by evidence that petitioner was exposed to harmful quantities of silicon dioxide dust during the course of his employment in the ten years immediately preceding his disablement. This contention requires a more detailed reference to the evidence.

It is uncontradicted that there are certain threshold values which have been established and verified through the years and which are generally accepted as reliable. Doctor Smart testified that threshold values represent limits under which workers may be repeatedly exposed day after day without harmful effect to their health; in quartz dust containing 50% or above free silica the threshold limit is 5 million particles per cubic foot; for dust of less than 50% and down to 5%, 20 million particles per cubic foot; and below 5%, 50 million particles per cubic foot. While it is broadly stated that individual susceptibility to the disease varies, this is true only of exposures above the threshold limits. If dust counts are below 5 million particles per cubic foot, new cases of silicosis do not develop. Seemingly there are individuals who when exposed to quantities of silicon dioxide dust above threshold values do not contract silicosis. In the present case there is no evidence which would support the conclusion that claimant was exposed to dust conditions above the threshold limits. Hence, we assume, as did the doctors, that claimant had silicosis in 1935 at the time of his first employment with the Company. It should be pointed out, however, that appellee was under no burden to prove an exposure to dust counts at his work site above the foregoing or any other formula. He was required to prove exposure to *harmful* quantities of silicon dioxide dust. Subd. A, par. 3, A.R.S. § 23–1107, supra.

Apparently, a silicotic condition can be aggravated by exposure to silicon dioxide

dust in less amounts than would be required to produce the disease initially. Doctor Smart testified that possibly after the lung had become infected and involved with silicosis and possibly with the complication or complications of pneumonia or tuberculosis, less dust would be required to aggravate the condition, and that injury to the lung might alter the ability to rid itself of silicon so that less silicon dioxide than threshold limits would be required to produce a further aggravation. He also testified that after exposure to silicon dioxide dust above the threshold limits some cases of silicosis will progress for a variable period of time; in the case of exposure to quartz dust somewhere between two or three years.

The claimant's first X-ray taken in 1941 was interpreted as showing silicosis in approximately the first stage, and his last X-rays in 1957 as showing silicosis in the third stage. On this evidence the Commission could infer, because claimant's condition steadily worsened, that the cause was the inhalation of harmful quantities of silicon dioxide dust during this time; that is, quantities harmful to this claimant. This inference is supported by the testimony of Doctor Smart who testified that he found "a little more silicosis" in the X-ray of 1957 than was shown in the X-rays of 1950.

The Commission's conclusions were further reinforced by other evidence, particularly of the chemical nature of the dust conditions under which claimant worked. By statute, subd. C, A.R.S. § 23–1107, it is provided:

"Proof of the exposure to silicon dioxide dust or asbestos dust for a period of not less than one thousand two hundred work shifts in employment in this state, with proof of total disability from silicosis or asbestosis, shall be prima facie evidence of exposure to harmful quantities of such dust during all of such period."

There was testimony that there was dust in the tank house every day; that in particular, while claimant was working on repairs in tanks there was "a lot of dust." Claimant's testimony to some extent inferentially excluded the possibility of inhaling an abnormal quantity of dust during his nonworking hours, since he testified that when he was at home nights he "just worked around the house."

The evidence of the nature of the dust as silicon dioxide dust is slight but sufficient to invoke the presumption of exposure to harmful quantities. However, it should first be stated that claimant's own evidence was wholly unsatisfactory in this regard. He produced evidence of the result of a chemical analysis of nine specimens of dust collected from various places, such as the walls and rafters of the tank house. While this analysis was

ostensibly labeled "Silica [$SiO_2$]", in quantities up to 20% of the sampled specimens, the probative value was completely destroyed by the chemist, Claude E. McLean, who testified that the written report, claimant's exhibit No. 6, did not purport to show the amount of silicon dioxide in the samples. This was for the reason that his test was for total silica content and hence, as he said, it "would be impossible to tell whether there is any free silica there or not." The Company's assignment of error complaining of admission of claimant's exhibit No. 6 as erroneous is correct.

▉ The Company's evidence supplied the deficiency in the claimant's proof. Late in October of 1957, the Company submitted a sample of dust collected from the southeast portion of the tank house for chemical analysis. The testimony of the chief chemist for the Company established that this dust contained 1% silicon dioxide. This was the only test submitted by either party as to the exact chemical content of the dust in the tank house insofar as it contained silicon dioxide. Plainly, to establish exposure to harmful quantities of silicon dioxide dust under subd. C, A.R.S. § 23–1107, supra, the proof must be of exposure to dust containing silicon dioxide. The legislature has not seen fit to specify what quantity of silicon dioxide in dust is necessary to establish that the

dust is prima facie harmful. It is sufficient if there is exposure to silicon dioxide in the form of dust, and accordingly proof of any quantity of silicon dioxide in the dust inhaled by claimant is sufficient to invoke a prima facie case of harmful quantities.

Independent of the prima facie evidence arising from the chemical analysis of the dust, the medical evidence tends to confirm the harmful effect of this quantity of silicon dioxide in the dust. Doctor J. D. Hamer, a member of the Medical Board, appointed pursuant to subd. C, A.R.S. § 23–1123, testified in part:

"* * * If I had silicosis prior to ten years ago and I worked in an exposure of dust of the counts that you indicated, I would expect to get some aggravation of the pre-existing condition by still breathing it, but to draw a line between how much aggravation and how much due to progression in a natural course, I can't do that."

Doctor Smart was asked whether claimant's physical condition today was due to exposure during his working hours to harmful quantities of dust containing free silica since 1947. He answered:

"I think from my examination and my review of the x-rays and the occupational history given me by the patient that his silico-tuberculosis is due

*chiefly* to exposure before 1947." [Emphasis supplied.]

The use of the qualifying adverb "chiefly" reasonably suggests that claimant's condition is due, at least in part, to exposure since 1947.

The Company's next assertion is that the Commission erred in finding that the claimant's condition followed as a natural incident of the work as the result of the exposure occasioned by the nature of applicant's employment. This assignment is predicated on A.R.S. § 23–1103. That statute provides in its material portions:

*"Proximate causation*

"The occupational diseases defined by § 23–1102 shall be deemed to arise out of the employment only if:

"1. There is a direct causal connection between the conditions under which the work is performed and the occupational disease.

\* \* \* \* \* \*

"4. The disease does not come from a hazard to which workmen would have been equally exposed outside of the employment."

 It is to be noticed that not only does subdivision 1 require a causal connection between the working conditions and the occupational disease, but that subdivi-

sion 4 imposes the further requirement that the hazard of exposure to the disease be greater under the working conditions than the hazard of exposure outside of the employment; that is to say, that the hazard of contracting the disease is an occupational hazard. Since the burden of proof to establish the causation is on the claimant, Phelps Dodge Corporation v. Ford, 68 Ariz. 190, 203 P.2d 633, it is the claimant's burden to establish as a reasonable probability that the risk of exposure to silicosis was greater at his work site than the risk of exposure outside of the employment.

 We observe at this point that certain evidence was introduced by the Company of the dust conditions in Miami, Arizona, where the claimant lived. Tests made in the community in which the workman resides are sufficient to satisfy the requirements of the phrase "outside of the employment" because such evidence could possibly establish that workmen would there be equally exposed to the same or greater hazards; and hence that the hazard of aggravation of the pre-existing silicotic condition was not an occupational hazard within the contemplation of the Act.

The construction we have herein placed on § 23–1103 is consistent with the legislative intent to be gathered from the reading of the entire Act. In most instances

of occupational diseases, as for example impairment of vision due to acetylene or electric arc welding, the circumstances surrounding the employment will negative the possibility of contracting the disability outside of the employment. In the particular case of silicosis where the employee has been working underground in quartz, the inference can readily be drawn by the Commission that the silicon dioxide content of the dust in the air where the workman is employed is greater than outside of his employment and hence the hazard of exposure is greater. Similarly, the inference can be drawn that workmen in such places as crushing plants or using air hammers or other equipment working quartz or quartz ores are subjected to a greater exposure of silicon dioxide dust within the employment. However, the inference necessarily becomes progressively weaker as the employee's proximity to the working of quartz ore decreases until finally no reasonable inference can be drawn that the dust inhaled is of greater silicon dioxide content than dust to which the employee would be exposed outside of his employment.

█ There is no satisfactory evidence in the record in this case tending to prove that the Company's mining operations are in quartz or in quartz ores. Therefore, no inference can be drawn from the close proximity to the mining operations. Proof of the silicon dioxide content in the air at the tank house does not establish that the silicon dioxide content of the air there is either greater or less than the silicon dioxide content of the air to be found in the dust at Miami. Hence, while there is evidence to sustain the Commission in its finding that the claimant has been exposed to harmful quantities of silicon dioxide dust, there is nothing to establish that the exposure to such dust was greater at the site of the claimant's employment, the tank house, than outside in the community in which he resides.

In endeavoring to establish dust conditions, the Company submitted proof of both the silicon dioxide content of the air and of the total dust counts in the air in several places in Miami as being greater than the silicon dioxide content and dust counts at the tank house. The tests were taken some ten months after claimant became totally disabled. For obvious reasons they may or they may not represent a true picture of the dust conditions both in the tank house and in Miami over the ten years under consideration. We think it sufficient to say if the Commission should find that the claimant's site of employment by reason of the proximity to the working of quartz ores gives rise to a reasonable inference of exposure to silicon dioxide dust greater than would be found outside of his employment, then it must decide whether

the tests as made by the Company rebut this inference.

From what has been said herein, we feel that it is unnecessary to discuss other assignments of error.

The award is set aside.

PHELPS, C. J., and UDALL, JOHNSON and BERNSTEIN, JJ., concur.