835 P.2d 469

Robert B. McCREARY, Petitioner,

v.

The INDUSTRIAL COMMISSION
OF ARIZONA, Respondent,

McDonnell Douglas Helicopter,
Respondent Employer,

Industrial Indemnity Ins. Co.,
Respondent Carrier.

No. 1 CA–IC 90–0039.

Court of Appeals of Arizona,
Division 1, Department C.

Jan. 14, 1992.

Reconsideration Denied March 11, 1992.

Review Denied Sept. 15, 1992.

**138**

Ely, Bettini & Ulman, by J. Wayne Turley, Phoenix, for petitioner employee.

Anita R. Valainis, Chief Counsel, The Industrial Com'n of Arizona, Phoenix, for respondent.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Donald L. Cross, J. Victor Stoffa, Phoenix, for respondents Employer and Carrier.

## OPINION

TAYLOR, Judge.

This is a special action review of an Arizona Industrial Commission award denying compensability. Because we conclude that the Administrative Law Judge ("ALJ") erred in applying the occupational disease statutes to this claim, we set aside the award.

## FACTS AND PROCEDURAL HISTORY

The record in this case is voluminous, technical, and conflicting. We must view the evidence in a light most favorable to support the award. *Pena v. Industrial Comm'n*, 140 Ariz. 510, 513, 683 P.2d 309, 312 (App.1984). In this light, the relevant facts are as follows.

Petitioner employee ("claimant") has had allergies since adolescence, for which he routinely took antihistamines. Claimant's medical history suggests that during periods of emotional stress, such as at the time of a prior divorce and when he was immersed in work projects, his allergies were exacerbated. Claimant's history also included treatment for alcohol abuse.

In 1985, respondent employer ("McDonnell Douglas") recruited and hired claimant as a computer engineer specializing in computer-generated flight simulation. Claimant subsequently directed a new flight simulation program for the Apache attack helicopter. Early in 1986, his health began to deteriorate. By July of that year, his regular antihistamine as well as other medications proved to be ineffective. During this period, claimant's second marriage began to deteriorate. Although the record is indefinite, claimant may also have begun drinking heavily at this time.

In September 1986, claimant moved into a new work facility, the Advanced Development Center ("ADC"). This building of over 300,000 square-feet integrated all functions related to the Apache attack helicopter. It included a self-contained office area similar to a large commercial building, various laboratories, and a manufacturing area. Construction of the office area had been substantially completed by late summer 1986. Rubber treads were installed in an office area stairwell in October 1986, and some painting was done to the simulator dome, which abutted the office area. Additional construction continued in the manufacturing area after September 1986. Although full-scale manufacturing had not yet begun, some of the laboratories and shops were operating. Claimant worked in the office area, but he entered and exited through the manufacturing area.

Approximately two months after this move, claimant's allergies were unmanageable. His symptoms included stuffiness, sinus pain, headaches, and chronic fatigue. Claimant was taking up to fifteen antihistamines (i.e., Sudafeds) and fifteen pain pills (i.e., Tylenols) a day. He also occasionally used Tylenol with codeine, and the record indicates he was now drinking heavily. As these symptoms and behaviors persisted, claimant developed additional symptoms of depression, loss of concentration, an inability to complete sentences, and tunnel vision. During this period, he separated from his wife and ultimately was divorced from her.

Claimant underwent counseling from January until May 1987. He then consulted medical doctors who practice "clinical ecology." One doctor recommended testing and evaluation by William Rea, M.D., in Texas. Another doctor diagnosed sensitivities to phenol, formaldehyde, and ethanol and recommended a medical leave of absence to avoid exposure to these chemicals in the work environment.

In June 1987, claimant stopped working for McDonnell Douglas and traveled to Texas for the recommended evaluation. In his history to Dr. Rea, claimant acknowl-

edged his long-standing allergies, but he told Dr. Rea that his symptoms were unremarkable until after the move to the ADC. Dr. Rea reported that chemical booth testing had been positive for formaldehyde and ethanol. He also reported that laboratory analysis showed increased blood levels of multiple volatile organic compounds ("VOCs"). Based upon claimant's history and the testing results, Dr. Rea diagnosed toxic brain syndrome, multiple chemical sensitivity syndrome, rhinosinusitis, and allergies to inhalants and foods. Regarding chemical sensitivity, Dr. Rea explained that

> [s]ome persons develop individual susceptibility after a single massive exposure. In others, this will not develop until after prolonged repeated exposures. But once a person has become susceptible, such a person appears to be injured, often permanently, as cross reactions then tend to develop to related synthetically derived materials.... [F]or instance, once individual susceptibility has been induced such persons frequently develop reactions of intolerance to such materials as synthetically derived chemical drugs, and especially to air pollutants including ambient and outdoor air pollutions of chemical origin, as well as, indoor air pollution. The mode of exposure may be either inhalation, ingestion or contact.

After leaving the ADC, claimant once attempted part-time computer work at home. He claimed that despite taking elaborate prophylactic measures, the exposure triggered disabling symptoms. On March 28, 1988, McDonnell Douglas prepared an employer's report of injury stating that claimant alleged he had suffered an "immune system breakdown and mental dysfunction" as a result of exposure to petrochemicals at work. On June 16, 1988, claimant filed an industrial injury claim alleging a gradual chemical exposure while working at the ADC. Respondent carrier denied compensability.

Multiple and lengthy hearings ensued. Witnesses included claimant, his former wife, several co-workers who had worked with claimant before and after the move to the ADC, other McDonnell Douglas personnel familiar with the manufacturing opera-

tions occurring at the ADC while claimant worked there, air conditioning specialists for both claimant and McDonnell Douglas, a chemical engineer for claimant, McDonnell Douglas's industrial hygienist, and medical witnesses for McDonnell Douglas.

In general terms, claimant attempted to prove that he was exposed to chemicals at the ADC from three sources: (1) manufacturing processes, with exposure resulting from cross ventilation of manufacturing and office areas and/or claimant's passage through the manufacturing area; (2) construction events, especially the installation of rubber treads in the office stairway; and (3) outgassing of VOCs from newly applied paints, adhesives, carpets, and other similar materials. He also attempted to prove that as a result of the exposure that had occurred, he suffered toxic brain syndrome, organic brain syndrome, immunological disorder, and/or multiple chemical sensitivity syndrome.

McDonnell Douglas vigorously opposed the claim, challenging claimant's credibility and disputing the reliability of the laboratory analysis of claimant's blood. Additionally, it denied the validity of the methods, findings, and diagnoses of claimant's medical experts. It produced evidence that air from the manufacturing area probably did not circulate into the office area, that exhaust systems in the operating laboratories and shops probably prevented exposure to chemicals used in these processes, and that the office area was well ventilated. It also produced evidence that VOCs are common in both indoor and outdoor environments. Finally, it produced medical evidence that claimant had no objectively demonstrable neurological, immunological, or other physical condition other than his preexisting allergies.

The ALJ then issued the award denying compensability. He rejected claimant's history that his health and personal problems began only after moving to the ADC. He found that the ADC was well ventilated and that any exposure to chemicals there was no greater than the exposure in the general non-work environment. Relying

on the testimony of McDonnell Douglas's medical experts, he found that any exposure that may have occurred at the ADC had not caused any physical disorder. Finally, the ALJ made a lengthy finding concerning chemical sensitivity. The ALJ applied the occupational disease statutes and concluded claimant's condition did not arise out of his employment because his exposure to chemicals at the ADC was no greater than his exposure in the general environment.[1] The ALJ affirmed on administrative review, and claimant brought this special action.

**1.** In the Consolidated Decision Upon Hearing and Findings and Award for Noncompensable Claim, finding 25 states in part:

In arriving at this conclusion [that claimant's condition did not arise out of his employment], the undersigned has applied the occupational disease statutes. An "occupational disease" must be due to causes and conditions characteristic of and peculiar to a particular trade, occupation, process or employment, and not the ordinary diseases to which the general public is exposed. A.R.S. § 23–901(12)(c). Further, A.R.S. § 23–901.01 provides that an occupational disease shall be deemed to arise out of employment only if all of the following six requirements exist:

1. There is a direct causal connection between the conditions under which the work is performed and the occupational disease.

2. The disease can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment.

3. The disease can be fairly traced to the employment as the proximate cause.

4. The disease does not come from a hazard to which workmen would have been equally exposed outside of the employment.

5. The disease is incidental to the character of the business and not independent of the relation of employer and employee.

6. The disease after its contraction appears to have had its origin in a risk connected with the employment, and to have flowed from that source as a natural consequence, although it need not have been foreseen or expected.

It should be noted that applicant contends that the conditions upon which he bases his claim do not constitute an occupational disease. The question of what constitutes an "occupational disease" is not clearly answered by the statutes. However, in *Phoenix Pest Control v. Industrial Commission,* 134 Ariz. 215, 220, 655 P.2d 39, 44 (App.1982), the court of appeals discussed this question. The court stated that occupational diseases are produced by the particular substances or conditions in-

## DISCUSSION

Our review focuses upon the following issues:

(1) whether the occupational disease statutes apply to this claim;

(2) whether an exacerbation of symptoms of nonindustrial allergies is compensable.

### The Occupational Disease Statutes

On review, claimant first asserts that the ALJ erred in treating his injury as a disease. He claims that the occupational dis-

herent in the environment of the employment. The Court also characterized occupational diseases as resulting from gradual exposure rather than a sudden traumatic injury and that the resulting condition is considered as a disease by medical practitioners. Applicant has characterized his exposure as having occurred over a period of months rather than as a result of an acute traumatic incident. Moreover, a full review of the medical evidence indicates that multiple chemical sensitivity syndrome is more in the nature of a disease, physical or psychological, rather than a condition resulting from an acute injury. Thus, application of the occupational disease statutes is appropriate in the present case. Applying those statutes, it is found that applicant has failed to meet his burden of proving that the multiple chemical sensitivities syndrome arose out of his employment. As set forth above, it has been found that applicant's exposure to chemicals was no greater at the ADC facility than experienced by applicant in the general environment. Thus, this case is not unlike the valley fever or silicosis cases which have been litigated in Arizona. *See Crawford v. Industrial Commission,* 23 Ariz. App. 578, 534 P.2d 1077 (1975); *Inspiration Consolidated Copper Company v. Industrial Commission,* 85 Ariz. 204, 335 P.2d 416 (1959). Moreover, in view of the debate within the medical community regarding the nature and cause of multiple chemical sensitivity syndrome, it may also be concluded that this condition is a result of psychological factors wholly unrelated to applicant's alleged exposure to chemicals at his work place [sic] and may actually be caused by medical opinions offered by applicant's physicians. Finally, although there is evidence to the effect that applicant's work environment may have caused an aggravation of his allergies, the mere aggravation of symptoms of a pre-existing nonoccupational disease is not compensable under the occupational disease provisions of the Workers' Compensation Act. *See Ford v. Industrial Commission,* 145 Ariz. 509, 519, 703 P.2d 453, 465 (1985).

ease statutes were improperly applied in determining that claimant's chemical sensitivity condition did not arise out of his employment with McDonnell Douglas.

In order for an industrial injury to be compensable under the Workers' Compensation Act, it must result from an "accident arising out of and in the course of" the claimant's employment. Ariz.Rev.Stat. Ann. ("A.R.S.") § 23–1021(A). Such an injury is defined in A.R.S. § 23–901(12) as:

> (a) Personal injury by accident arising out of and in the course of employment.
>
> . . . .
>
> (c) An occupational disease which is due to causes and conditions characteristic of and peculiar to a particular trade, occupation, process or employment, and not the ordinary diseases to which the general public is exposed, and subject to the provisions of § 23–901.01.

Among the special provisions of section 23–901.01 that are applicable to occupational diseases is the requirement that the employment increase the risk that results in the disease. *See* A.R.S. § 23–901.01(4) (An occupational disease arises out of the employment only if the "disease does not come from a hazard to which workmen would have been equally exposed outside of the employment.").

Three recent cases have discussed the occupational disease provisions. The first is *Phoenix Pest Control v. Industrial Comm'n*, 134 Ariz. 215, 655 P.2d 39 (App. 1982). In *Phoenix Pest Control*, an exterminator filed a gradual injury claim for an obstructive airways disease allegedly caused by routine exposure to pesticides used at work. The carrier requested the appointment of a medical panel pursuant to A.R.S. § 23–901.03. The ALJ denied this request, concluding that the claimant had a unilateral option to proceed with a gradual injury claim. This court set aside the award. It rejected the argument that the occupational disease statutes apply only to occupational diseases that were listed under prior law, which specified covered occupational diseases. *Id.* at 218–19, 655 P.2d at 42–43. It also generally defined an occupational disease as a condition that his-

torically has been considered a disease and that is produced by a gradual exposure to substances or conditions inherent in the employment environment. *Id.* at 220, 655 P.2d at 44. The court concluded that this definition applied to an obstructive airways disease allegedly resulting from a gradual exposure to pesticides that an exterminator used at work. The court stated the following general rule: "We conclude that under our present statutory scheme, *when the condition giving rise to the claim for workmen's compensation benefits is a disease*, either party is entitled to require that the claim be administered pursuant to the provisions of the workmen's compensation act governing occupational disease." *Id.* at 221, 655 P.2d at 45 (emphasis added).

*Phoenix Pest Control* was followed by *Ford v. Industrial Comm'n*, 145 Ariz. 509, 703 P.2d 453 (1985). In *Ford*, a miner filed a gradual injury claim for a disabling cough allegedly caused or aggravated by over twenty years of continuous exposure to heavy dust and other irritants. Despite the gradual injury claim, the ALJ applied the occupational disease statutes to this claim. On review to the supreme court, one issue was whether the occupational disease statutes had been misapplied to the claim. In concluding that these statutes had been properly applied, the supreme court expressly approved and adopted the above-quoted passage from *Phoenix Pest Control. Id.* at 514, 703 P.2d at 458.

The last of these cases is *Lorentzen v. Industrial Comm'n*, 164 Ariz. 67, 790 P.2d 765 (App.1990). In *Lorentzen*, a resident school teacher with preexisting allergies and a known sensitivity to pesticides filed an industrial injury claim for a severe allergic reaction when pesticides were applied to the school grounds. Citing *Phoenix Pest Control*, the ALJ denied compensability because (1) the condition for which the claimant sought benefits was a disease that did not result from causes or conditions characteristic and peculiar to a particular employment, (2) the condition resulted from the hazard to which the claimant was equally exposed outside of the employment, and (3) the condition was independent of

both the character of the business and the employment relationship. *See* A.R.S. §§ 23–901(12)(c)—901.01(4), (5).

The *Lorentzen* court set aside the award of non-compensability. 164 Ariz. at 67, 790 P.2d at 765. Distinguishing *Phoenix Pest Control*, the court concluded that the occupational disease statutes apply only if the disease for which benefits are claimed results from causes and conditions characteristic of and peculiar to a particular employment. *Id.* at 70, 790 P.2d at 768. Because the claimant was a school teacher, her exposure to a pesticide did not satisfy this requirement. *Id.* at 69, 790 P.2d at 767. The court also concluded that the claim was compensable as an injury by accident arising out of and in the course of the employment:

> A worker is entitled to workers' compensation under A.R.S. § 23–1021 if he or she is injured by an accident arising out of and in the course of his or her employment, unless the injury was purposely self-inflicted. Injury is caused by an "accident" within the Workers' Compensation Act where either the external cause or resulting injury itself is unexpected. *Paulley v. Industrial Commission*, 91 Ariz. 266, 371 P.2d 888 (1962). The injury need not be a result of sudden or external violence. *English v. Industrial Commission*, 73 Ariz. 86, 237 P.2d 815 (1951) (inhalation of gas use). The employer takes the employee as he finds him, and if the industrial injury operates on an existing weakness to produce further injurious results, industrial injury causes that result. *Maricopa County v. Industrial Commission of Arizona*, 134 Ariz. 159, 654 P.2d 307 (App.1982).
>
> . . . .
>
> [T]he elimination of her condition as an occupational disease does not mean that petitioner cannot recover for an injury if she can show that there was an accident, in other words, that either the external cause or resulting injury was unexpected. Petitioner knew that she was allergic to pesticides and testified that she did not accept the position in the Indian Oasis School District until she was assured by the school district that she would not be re-exposed to the chemicals to which she reacted. Since the external cause and the resulting injury were, therefore, not expected, she suffered an injury by "accident."

*Id.* 164 Ariz. at 69–70, 790 P.2d at 767–68.

We turn now to the arguments of the parties. Claimant argues that the current case is analogous to *Lorentzen* because he is a computer engineer who normally was not exposed to chemicals in the course of his work. Rather, he suffered the chemical sensitivity condition only because of exposure to chemicals used in new building materials (or, because other employees in the building used chemicals in the course of their work).

McDonnell Douglas argues that the ALJ properly applied the occupational disease statutes. It presents a lengthy historical analysis criticizing *Ford*. Whether or not *Ford* is historically accurate is a question for the historians, unless the supreme court reconsiders the matter. This court is bound to follow the pronouncements of the supreme court. *See McKay v. Industrial Comm'n*, 103 Ariz. 191, 193, 438 P.2d 757, 759 (1968).

McDonnell Douglas also argues that *Lorentzen* conflicts with *Ford*. As previously noted, *Ford* approved and adopted from *Phoenix Pest Control* the statement that the occupational disease statutes apply "when the condition giving rise to the claim . . . is a disease." 145 Ariz. at 514, 703 P.2d at 458. McDonnell Douglas argues that *Lorentzen* misapplied this test because the nature of the condition for which benefits are claimed is the sole criterion for applying the occupational disease statutes; that is, if a condition is a disease and the substantive requirements of these statutes are unsatisfied, the claim is noncompensable.

▮ In our opinion, when the test is read in the context of the cases adopting it, it applies only if the definitional requirements of section 23–901(12) are satisfied, i.e., it is a "disease which is due to causes and conditions characteristic of and peculiar to a particular trade, occupation,

---

process or employment, and not the ordinary diseases to which the general public is exposed...." In contrast, if the definitional requirements are satisfied but the proof requirements of section 23–901.01 are unsatisfied, the claim is noncompensable.

In *Phoenix Pest Control,* the claimant's exposure to pesticides indisputably occurred routinely and unavoidably in the course of his employment as an exterminator. 134 Ariz. at 216–17, 655 P.2d at 40–41. In that case, the only dispute concerned whether purely procedural requirements of the occupational disease statutes applied to the claim. The court unconditionally held that if the condition for which benefits were claimed is a disease, the occupational disease statutes apply to the claim.

On the other hand, *Ford* more conclusively supports the distinction between definitional and proof requirements. The court indicated that the issue to be decided is "whether a claimant whose disability is attributable to a work-related disease must proceed under the special provisions of the Act relating to occupational disease, or whether he may elect to proceed under the general provisions relating to accidental injuries." *Ford,* 145 Ariz. at 510, 703 P.2d at 454. The court held that "a condition *which is an occupational disease under the definitions of the Act* must be considered under the special provisions applicable thereto." *Id.* at 512, 703 P.2d at 456 (emphasis added).

McDonnell Douglas argues that *Ford* extended the occupational disease statutes to a claim that failed to satisfy the definitional requirements of section 23–901(12). This is so, contends McDonnell Douglas, because "[i]n *Ford,* claimant was exposed to dust which is rather common to a great many employments."

We disagree with this analysis of *Ford.* We conclude that *Ford* distinguished the definitional requirements from the proof requirements of the occupational disease statutes. These statutes apply to a claim only if the definitional requirements are satisfied. Again, this requires not only a claim for a disease but also a claim for a disease "which is due to causes and conditions characteristic of and peculiar to a particular trade, occupation, process or employment, and not the ordinary diseases to which the general public is exposed...." To this extent, we accept the analysis in *Lorentzen.*

■ Applying this test to the current case, we conclude that claimant's medical condition did not result from causes and conditions characteristic of and peculiar to his employment as a computer engineer. The ALJ found that the only sources of chemical exposure were construction events in the office building and normal low level outgassing that occurred in the new but well-ventilated ADC. In our opinion, an occupational disease must result from the nature of the employment, that is, it is an unavoidable risk of the type of work itself. For those not involved in the construction trades, risks related to construction events or to a new building would not normally satisfy this requirement.[2] *See Vernoia v. National Council on Compensation Ins.,* 147 A.D.2d 863, 538 N.Y.S.2d 85 (1989) (denying occupational disease claim by attorney whose preexisting allergies exacerbated by exposure to dust during construction); *Dando v. Binghampton Bd. of Educ.,* 111 A.D.2d 1060, 490 N.Y.S.2d 360 (1985) (denying occupational disease claim by school teacher with preexisting allergies who reacted to hydrocarbon chemicals in newly constructed area at school).

■ Moreover, we conclude that claimant's injury is similar to that in *Lorentzen.* The development of claimant's alleged chemical sensitivity condition was unexpected and accidental in that claimant did not expect the move to a new building to result in the injury. Therefore, the injury by accident provision in A.R.S. § 23–

2. The seminal accidental injury case, *In re Mitchell,* 61 Ariz. 436, 150 P.2d 355 (1944), is consistent with this analysis. In *Mitchell,* a worker customarily used carbon tetrachloride, but this exposure was harmless in a well-ventilated area. The worker suffered a fatal exposure, however, when he used the chemical in a cramped, poorly-ventilated area. The supreme court concluded that the death resulted from an injury by accident. *Id.* at 452, 150 P.2d at 361.

901(12)(a) should be applied to determine whether claimant's injury is compensable.

*Exacerbation of Symptoms of Nonindustrial Allergies*

■ A claim is compensable if work activity combines with a preexisting condition to cause a further injurious result. *Mandex, Inc. v. Industrial Comm'n*, 151 Ariz. 567, 569, 729 P.2d 921, 923 (citing *Professional Furniture Serv. v. Industrial Comm'n*, 133 Ariz. 206, 209, 650 P.2d 508, 511 (App.1982)). This principle is based on the well-established law "that an employer takes an employee 'as is,' that is, with whatever peculiar vulnerabilities the employee may have...." *Murphy v. Industrial Comm'n*, 160 Ariz. 482, 486, 774 P.2d 221, 225 (1989) (quoting *Kelly's Case*, 394 Mass. 684, 686–87, 477 N.E.2d 582, 584 (1985)). The same principle applies whether the preexisting condition is industrial or nonindustrial. *Mandex*, 151 Ariz. at 570, 729 P.2d at 924. "[T]here is a compensable claim for work-related exacerbation of symptoms that themselves require medical treatment." *Id.*

■ The critical issue in this case is whether claimant's condition was causally related to his employment. Legal causation in worker's compensation cases requires that the injury result from an "accident arising out of and in the course of" the claimant's employment. A.R.S. § 23–1021(A). The phrase "arising out of" refers to the cause or origin of the injury. *Murphy*, 160 Ariz. at 485, 774 P.2d at 224.[3] The issue becomes whether claimant's condition "arose out of" his employment.

This court has examined four concepts to determine whether an injury arises out of employment: (1) the peculiar risk test, which requires the claimant to show that the source of the injury must be in its nature peculiar to the employment; (2) the increased risk test, which requires that the employment cause "an increased exposure to a risk which is qualitatively not peculiar to the employment;" (3) the actual risk test, in which it is immaterial that the risk is common to the public, if it is in fact a risk of the particular employment; and (4) the positional risk test, in which the "injury is compensable if it would not have occurred but for the fact the employment placed the employee in a position where he or she was injured." *Nowlin v. Industrial Comm'n*, 167 Ariz. 291, 293, 806 P.2d 880, 882 (App.1990) (citing 1 A. Larson, *Workmen's Compensation Law*, §§ 6.20 to 6.50 (1990)).

In accordance with the occupational disease statutes, the ALJ applied the increased risk test in concluding that claimant's injury did not arise out of his employment. The ALJ found that claimant's exposure to chemicals was no greater at the ADC facility than experienced by claimant in the general environment.

■ Although we have determined that the ALJ erred in applying the occupational disease statutes, McDonnell Douglas argues that the increased risk test applies in this case, even if the occupational disease statutes do not apply. Recent cases, however, have disavowed the increased risk test in Arizona cases involving an injury by accident. *See Circle K Store #1131 v. Industrial Comm'n*, 165 Ariz. 91, 94 n. 2, 796 P.2d 893, 896 n. 2 (1990); *Samaritan Health Servs. v. Industrial Comm'n*, 170 Ariz. 287, 291–292, 823 P.2d 1295, 1299–1300 (App.1991).

In *Samaritan*, a claimant with a history of knee problems suffered a knee injury while stooping to open a file drawer at her place of employment. Citing *Pauley v. Industrial Comm'n*, 109 Ariz. 298, 508 P.2d 1160 (1973), this court found that the knee injury was accidental under the workers' compensation statute. *Samaritan*, 170 Ariz. at 291, 823 P.2d at 1299. The respondent employer argued that to satisfy the statutory requirement that the injury arise out of employment in cases when a personal condition and a work-related injury combine to cause the injury, the risk of injury from the work-related activity must be greater than the risk of injury associat-

---

3. The phrase "in the course of" generally "refers to the time, place, and circumstances of the accident in relation to the employment." *Murphy*, 160 Ariz. at 485, 774 P.2d at 224.

ed with nonemployment activities. The court concluded, however, that an increased risk of injury is not necessary as long as the employment *contributes* to the injury. *Id.* at 288–291, 823 P.2d at 1296–1299. The "actual risk" test was applied to determine that a work-related activity (i.e., stooping to file) was in fact a contributing cause of claimant's knee injury. The court concluded that "the injury arise out of employment" requirement was satisfied.

We believe the "actual risk" test, likewise, applies in this case. When claimant's injury allegedly resulted from a combination of his preexisting allergies and exposure to chemicals from the construction of the new building, the work-related exposure need only have in fact contributed to claimant's condition to satisfy the "arising out of" requirement.

The findings in the current award regarding causation are conflicting and somewhat ambiguous. There was conflicting evidence as to whether claimant's injury was caused by chemical exposure in his work place or stress in his personal life, including marital problems and abuse of alcohol and medications. On the one hand, the ALJ accepted McDonnell Douglas's expert testimony. The ALJ found that claimant has no neurological or physical disorder as a result of the alleged exposure to chemicals at the ADC.[4] On the other hand, he acknowledged in his findings that exposure to chemicals at the ADC may have *contributed* to the exacerbation of claimant's allergy symptoms.[5]

He concluded that under the occupational disease statutes, claimant's condition did not arise out of his employment. We are unable to determine whether the ALJ would have made the same findings and

conclusions outside the context of the occupational disease statutes. Further, an unambiguous determination must be made regarding the relationship of claimant's chemical sensitivity condition and any exposure to chemicals in the ADC. Assuming that the ALJ finds a causal relationship between claimant's condition and exposure to chemicals at his work place, the "actual risk" test must be applied to determine whether his condition arose out of his employment under the workers' compensation statute.

## CONCLUSION

Having determined that the occupational disease statutes and the increased risk test were misapplied in this case, we set aside the award.

EHRLICH, P.J., and FIDEL, J., concur.

---

**4.** In the Consolidated Decision Upon Hearing And Findings And Award For Noncompensable Claim, finding 23 states in part:

To the extent that there are conflicts between the opinions expressed by applicant's physicians and the defense physicians, the opinions expressed by Drs. Bamford, Sullivan, Pinnas and Bevan are accepted by the undersigned as being more probably correct and well-founded. Thus, it is expressly found by the undersigned that applicant has no neurological or physical disorder as a result of the alleged exposure to chemicals at the ADC facility. By

accepting the testimony and opinions expressed by [defense witnesses] over applicant's witnesses, it is found that the ADC facility was well-ventilated, that the air supply in applicant's work areas was not contaminated by chemicals which may have been released in other areas of the ADC facility and that any exposure that applicant had to chemicals was no greater than exposure to chemicals he experienced outside the work environment.

**5.** *See* note 1, *supra.*