962 P.2d 903

**Sharron MARTINEZ, Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Ideal Weight Loss Centers aka Quick Weight Loss Center, Respondent Employer,**

**ITT Hartford, Respondent Carrier.**

**No. CV-97-0201-PR.**

Supreme Court of Arizona, En Banc.

July 17, 1998.

Thomas R. Stillwell, Phoenix, for Petitioner.

Anita R. Valainis, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for Respondent.

Jones, Skelton & Hochuli by Terrence Kurth, Phoenix, for Respondents Employer and Carrier.

## OPINION

JONES, Vice Chief Justice.

¶1   This case involves a "mixed risk" workers' compensation claim that is predicated on claimant's gradual injury.   Two issues are presented:

    1.   May a court of appeals' opinion which this court depublished because, although it agreed with the result, it did not agree with the analysis, constitute the law of the case in subsequent proceedings?

    2.   What is the proper measure of legal causation in a gradual injury "mixed risk" claim?

We have jurisdiction pursuant to Ariz. Const. art.  VI, § 5(3), and A.R.S. § 12–120.24.

## FACTS AND PROCEDURAL BACKGROUND

¶2   In 1988, claimant Sharron Martinez developed Kienbock's disease, a nonindustrial deterioration of the lunate bone in her right wrist.   This condition led to surgery in which the lunate bone was removed and a partial wrist fusion was performed.   Although the fusion placed increased stress on the radiocarpal joint, claimant, free from wrist pain, was medically discharged in July 1989.

¶3   Soon thereafter, claimant found work as a counselor with respondent, Ideal Weight Loss Centers.   The work required repetitive use of her right hand to handwrite medical histories and obtain blood pressure readings with a manual pump.

¶4   By November 1989 claimant began suffering wrist pain once again, and in January 1990 sought further treatment.   Robert Wilson, M.D., diagnosed degenerative arthritis of the radiocarpal joint and in March 1990 performed a total wrist fusion.

¶5   In July 1990, claimant filed a claim for workers' compensation benefits.   In the physician's report, Dr. Wilson reported that "[it] would appear that [claimant's] work activities were a contributing factor to the ag-

gravation of her underlying condition." Respondent carrier ITT denied compensability.

¶ 6  Claimant protested this denial, and hearings were held. Both lay and medical evidence presented at the hearings conflicted. Claimant testified that her problems increased in October 1989 when she became responsible to record most of the clinic's medical histories, requiring that she write six to seven hours a day. She acknowledged, however, that she also had wrist pain when she performed many household chores and other ordinary activities. Claimant's supervisor verified that claimant performed the handwriting tasks in question, but believed that claimant greatly over-estimated the amount of writing that her duties required.

¶ 7  Dr. Wilson testified that, in his opinion, the deterioration in claimant's wrist would have developed over time even if claimant had not worked with her hand. He acknowledged that all uses of the hand, both on and off the job, contributed to the deterioration, but he could not say that handwriting was more stressful than ordinary activities or that claimant's handwriting on the job accelerated the deterioration.

¶ 8  James G. Beauchene, M.D., agreed that claimant had developed radiocarpal arthritis as a result of wear and tear of the wrist. In his opinion, however, handwriting was more stressful than many ordinary activities because it mechanically loaded the radiocarpal joint. He testified that if claimant wrote up to six hours a day, there was no question that her work would have accelerated the deterioration of the radiocarpal joint.

¶ 9  The Administrative Law Judge ("ALJ") entered an award for a compensable claim. He resolved the lay conflict by accepting the supervisor's testimony about the extent of claimant's handwriting. With regard to the medical testimony, he made the following dispositive finding:

> The differences between the testimony and opinions of Dr. Beauchane [sic] on the one hand and Dr. Wilson on the other are slight. Applicant was required to use her hand by gripping a pen or pencil and writing to a considerable extent. Whether she was required to do so for six hours as opposed to two or three hours per day

does not, in the last analysis, appear to be critical. The reported decisions of the Arizona appellate courts on the issue of legal causation do not provide crystal clear tests for cases such as this. However, the decision of the Court of Appeals in *Samaritan Health Services v. Industrial Comm'n,* [170 Ariz. 287, 292, 823 P.2d 1295, 1300 (App.1991),] appears to control. In that case the court discussed the "actual risk test," which is applied in determining whether an injury arises out of employment where work-related activity and a personal condition combine to cause an injury. In *Samaritan,* the court said: "It is not necessary to show that the risk of injury from the work-related activity was greater than the risk of injury in nonemployment activities." ... Even if applicant's work related activities did not increase her risk of injury, they, together with nonemployment activities, combined to cause an injury.

¶ 10  On review, the court of appeals set aside the award, finding that the ALJ misapplied *Samaritan* to this case. *Samaritan,* it reasoned, involved a specific trauma uniquely related to the employee's job duties. This case, however, lacked that unique relationship because it involved a combination of work and daily nonwork activities. Relying instead on *Pearce Development v. Industrial Commission,* 147 Ariz. 598, 712 P.2d 445 (App.), *aff'd in part and vacated in part,* 147 Ariz. 582, 712 P.2d 429 (1985), the court found the question to be whether the degeneration occurring at work "materially contributed to the disability or to the need for medical treatment." Although Dr. Beauchene testified that claimant's work accelerated the degeneration, that testimony lacked factual foundation because it assumed the accuracy of claimant's history of writing six hours a day, which the ALJ rejected. Moreover, even if the testimony could support the award, the ALJ failed to resolve the conflict in the medical testimony.

¶ 11  This court denied claimant's petition for review. However, because the court disagreed with the court of appeals' analysis, though it agreed with the result, we ordered the court of appeals' opinion be depublished.

Thus, the ALJ's award was vacated and the case was returned to the Industrial Commission. At the subsequent hearing, the ALJ heard additional testimony from Dr. Beauchene and determined that although the court of appeals' opinion had been depublished, it still constituted the law of the case and, based on the evidence, proceeded to apply the "material contribution" standard from *Pearce* set forth in the depublished opinion. For purposes of his decision, the ALJ assumed that claimant spent four hours per day performing tasks that involved writing. He accepted Dr. Wilson's testimony over Dr. Beauchene's "to the extent they differ" and concluded:

> It may be that the act of gripping a pen places more stress on the radial carpal joint and thus causes some accelerated degeneration as oppose[d] to "ordinary" activities of daily living (common sense suggests that this is probably the case). However, the affect [sic] of what is in this case a work related activity is, in the view of the undersigned, insubstantial.... While it seems to the undersigned that it is more probable than not that applicant's work activity accelerated her degeneration to some degree, the evidence compels the conclusion that it did not materially contribute to her disability or her need for medical treatment in any respect. It is found that applicant has failed to sustain her burden of proving that she has sustained a compensable injury.

¶ 12 The court of appeals affirmed the ALJ's award, holding that the depublished opinion constituted the law of the case and that the "material contribution" standard was correct, as opposed to the *Samaritan* "actual risk" standard. It also found that the ALJ resolved the conflicts that were fatal to the initial award, and, based on Dr. Wilson's testimony, that the ALJ properly entered an award for a noncompensable claim.

## DISCUSSION

### A. Applicability of the "Law of the Case" Doctrine

¶ 13 This court upheld the result in the first court of appeals' opinion, but rejected the analysis, without opinion. On remand, the ALJ applied the analysis of the first decision as the law of the case. In its second decision, the court of appeals acknowledged that this court disapproved of "something" in the first opinion, but there was no way to discern what was objectionable. The court then essentially applied the same analysis as the first case.

¶ 14 The "law of the case" doctrine is a rule of policy, not law. Due to its harshness, many exceptions have arisen. For example, it does not apply when "there has been an error in the first appellate decision so as to render it manifestly erroneous or unjust; ... [or] the issue was not actually decided in the first decision or the decision is ambiguous." *Dancing Sunshines Lounge v. Industrial Comm'n*, 149 Ariz. 480, 483, 720 P.2d 81, 84 (1986).

¶ 15 In this case, both exceptions are independently applicable. The court of appeals erroneously applied the "material contribution" standard to the facts, and it would be unjust to hold claimant to this more stringent burden of proof. Further, as the court of appeals recognized in its second decision, this court's depublication order was, at best, ambiguous. We disapproved of "something," as the court of appeals said, but it was not clear what. Under these circumstances, we conclude the law of the case principle should not be applied to this claim. To do so would deprive claimant of compensation to which she may be rightfully entitled just because this court improvidently failed to consider the effect of its depublication order on the litigants. We therefore move to the issue on the merits.

### B. The Appropriate Measure of Legal Causation

¶ 16 The Arizona Constitution is the beginning point for our discussion. It requires that the legislature enact a Workers' Compensation Act to provide compensation to employees for any work-related injury that

> aris[es] out of and in the course of, such employment, is caused in whole, or in part, or is contributed to, by a necessary risk or danger of such employment, or a necessary

risk or danger inherent in the nature thereof.

Ariz. Const. art. 18, § 8.

¶ 17 The "purpose of workers' compensation law is to shift the burden of loss of work-related accidents and disease from the individual employee to ... the consumer." *Samaritan*, 170 Ariz. at 290, 823 P.2d at 1298. Under this guiding principle, the legislature has established the policies and the courts have developed law designed to shed light on cases in which a pre-existing injury is accelerated by employment activity. This court has long held that an employer takes an employee "as is," so that if a current injury operates on a pre-existing injury or has a predisposition to produce further injury, the current injury is compensable. *Murray v. Industrial Comm'n*, 87 Ariz. 190, 349 P.2d 627 (1960). Thus, an industrial accident need not be the sole cause of an injury, so long as it is *a* cause. *See, e.g., Allen v. Industrial Comm'n*, 124 Ariz. 173, 602 P.2d 841 (App.1979).

¶ 18 The degree of causation required to obtain workers' compensation may include any of the following: (1) the largely abandoned "peculiar risk doctrine" (the source of harm must be peculiar to the occupation); (2) the "increased risk doctrine" (the employment must quantitatively increase the chance of injury); (3) the "actual risk doctrine" (the employment must merely subject the worker to risk of any injury); or (4) the "positional risk doctrine" (but for the employment placing the worker in a particular position or location, the injury would not have occurred). 1 A. Larson, *The Law of Workers' Compensation* § 6 (1998).

¶ 19 The standard of causation is not constant in workers' compensation cases but varies with the nature of the injury, or, according to Professor Larson, the "categories of risk." 1 A. Larson, *The Law of Workers' Compensation* § 7 (1998). Two categories of risk present no problem with respect to causation: those uniquely associated with a particular employment, in which causation is clear, and those entirely personal to the worker, in which there is no causal connection to the employment. In addition, "neutral risks" are those that are not associated with either employment or the person—for example, a worker in a factory is hit by a stray bullet out of nowhere, or the cause of injury is unknown, or the employee suffers an inexplicable slip and fall. There are also "mixed risks," in which a personal cause and an employment cause combine to produce the harm—for example, a person with a weak heart dies or is disabled from occupational stress. *Id.* § 7.

¶ 20 The case at bar is a "mixed risk" case of combined personal and employment causation. According to Professor Larson, in "mixed risk" cases, "[t]he law does not weigh the relative importance of the [personal and employment] causes, nor does it look for primary and secondary causes; it merely inquires whether the employment was a contributing factor." *Id.* § 7. As such, we are dealing merely with another definition of the "actual risk" doctrine on which the court relied in *Samaritan*. There, the worker's knee "popped" when she bent down to get a file. The bending activity operated on a pre-existing knee condition to cause a second injury. The court held that the actual risk test should apply where a "work-related activity and a personal condition combine to cause an injury." 170 Ariz. at 292, 823 P.2d at 1300. *See also McNeely v. Industrial Comm'n*, 108 Ariz. 453, 501 P.2d 555 (1972) (sufficient causation between employment and death where the work activity accelerated the employee's heart attack); *Division of Vocational Rehab. v. Industrial Comm'n*, 125 Ariz. 585, 611 P.2d 938 (App. 1980) (sufficient causation where a welder's work-related bending activity contributed to a back injury).

¶ 21 In this case, the ALJ initially found the injury compensable under the testimony of both experts because both testified that claimant's writing activity at work contributed to the degeneration of her wrist condition satisfying the "actual risk" test. The court of appeals took a different view, however, believing that *Samaritan* did not apply because the injury claimant suffered in the instant case was gradual, developing over a period of time. We have analyzed that rationale and find no reason to distinguish be-

tween specific traumatic injuries and gradual injuries in this regard.

¶ 22   Pearce does not require a contrary conclusion. *Pearce* was a successive injury case, primarily concerned with the question which carrier was responsible, not whether the injury would have occurred with or without the work activity in question. We view the principles which underlie cases involving successive injury as not applicable to the analysis of causation requirements for compensability. The question to be determined under the successive injury analysis is a question of liability preference; that is, which carrier must compensate the employee for the current injury. This question is resolved, of course, by determining the nature and cause of the injury. *See Pearce*, 147 Ariz. at 601, 712 P.2d at 448. The causation standard in successive injury cases, therefore, does not decide the question *whether* the injury is compensable, but rather decides *who* will provide the compensation. As a matter of carrier preference, then, the successive injury doctrine will apply and the appropriate carrier be held liable if, *inter alia,* the causal connection between the work activity and the injury is sufficient. Because the question being decided in successive injury cases involves liability allocation among carriers rather than compensability, we think it advisable to apply a causation standard that is higher than when compensability alone is at issue. Under *Pearce*, that standard is a variation of the increased risk test, requiring a "unique relationship to work." In *Pearce*, we approved and adopted "[t]he opinion of the court of appeals *as it relates to the law of successive injury* in Arizona," but vacated the remainder of the opinion. 147 Ariz. 582, 583, 712 P.2d 429, 430 (1985)(emphasis added). The court of appeals apparently did not attach significance to the emphasized words and applied an "independently compensable" standard of causation to the preliminary issue of compensability. We now specifically limit the *Pearce* analysis to cases involving successive injuries.

¶ 23   The reason offered by the court of appeals for a departure from Arizona law in the instant case is that here we address a gradual injury operating on a pre-existing condition rather than a specific traumatic event operating on such a condition. We conclude, however, that this distinction is not consistent with the cases relied on by the court in *Samaritan,* nor is it consistent with general workers' compensation policy. We do not accept the notion that one injury is compensable because it is caused by a single traumatic event which aggravates a pre-existing condition, but another injury is not compensable because employment activity that is repetitive gradually aggravates a pre-existing condition.

¶ 24   When the correct standard is applied to the evidence, the ALJ will view the gradual injury and the specific traumatic event as requiring similar analysis. As the ALJ recognized, the difference between Drs. Wilson and Beauchene was not a difference in kind, but only one of degree. Dr. Beauchene opined that claimant's injury would not have occurred as quickly had she not engaged in her work activity. Dr. Wilson testified that to the extent use of the wrist aggravated the degeneration, work activity did not aggravate the condition more than any other daily use, but that both uses contributed. Both experts thus indicated that use of the wrist, including work-related use, aggravated the condition. The discrepancy pertains only to a determination of the extent to which use of the wrist caused aggravation. Under *Samaritan,* this distinction is legally irrelevant. A work-related contribution is all that is necessary. Dr. Wilson would describe the causal relationship as being "very broad, [and] very general." This would nevertheless satisfy the "actual risk" test.

## CONCLUSION

¶ 25   We hold that the "actual risk" test defined in *Samaritan* applies to cases such as this in which the work activity contributes to gradual aggravation of a pre-existing condition to cause an injury.

¶ 26   We therefore vacate the court of appeals' memorandum decision and remand the case to the Industrial Commission for new findings and an award consistent with the

correct standard and the principles set forth in this opinion.

ZLAKET, C.J., and MARTONE, FELDMAN and BRAMMER, JJ., concur.

NOTE: Justice JAMES MOELLER did not participate in the determination of this matter; pursuant to Ariz. Const. art. VI, § 3, the Honorable WILLIAM BRAMMER, Jr., Judge of the Arizona Court of Appeals, Division Two, was designated to sit in his stead.