IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

_____

WESTERN MILLWORK, *Petitioner Employer*,

CINCINNATI INSURANCE COMPANY, *Petitioner Insurance Carrier*,

*v.*

THE INDUSTRIAL COMMISSION OF ARIZONA, *Respondent*,

KENNETH ZERBY (deceased), through his widow DIANE ZERBY,
*Respondent Employee*.

No. 1 CA-IC 22-0038
FILED 9-21-2023

_____

Special Action - Industrial Commission
ICA Claim No. 20210490044
Carrier Claim No. 3700415
The Honorable Paula R. Eaton, Administrative Law Judge

**AWARD AFFIRMED**

_____

COUNSEL

Lundmark Barberich La Mont & Slavin PC, Phoenix
By R. Todd Lundmark, Eric W. Slavin, David Lundmark
*Counsel for Petitioner Employer and Insurance Carrier*

Industrial Commission of Arizona, Phoenix
By Gaetano J. Testini
*Counsel for Respondent*

Snow Carpio & Weekley PLC, Phoenix
By Dennis R. Kurth
*Counsel for Respondent Employee*

---

**OPINION**

Judge Michael S. Catlett delivered the Court's opinion, in which Presiding Judge Paul J. McMurdie and Judge Michael J. Brown joined.

---

**C A T L E T T**, Judge:

¶1 COVID-19 has had an immeasurable impact on society. The issue we confront is what impact it will have on our workers' compensation jurisprudence. Relying on a series of Arizona appellate decisions about Valley fever, Western Millwork ("Employer") asks us to hold that death from COVID-19, even if traceable to interactions with a co-worker while on duty, is non-compensable as a matter of law. Diane Zerby ("Wife") asks us to treat COVID-19 the same as other diseases—able to cause a compensable injury if it arises out of and in the course of employment. We hold that death or injury from COVID-19 is compensable where the statutory requirements for workers' compensation are met. And because Wife's claim meets such requirements, we affirm the award.

**FACTS AND PROCEDURAL BACKGROUND**

¶2 In October 2020, Kenneth Zerby ("Zerby") worked as a design engineer for Employer. Zerby typically worked four or five days a week in Employer's Phoenix offices. When the COVID-19 pandemic began, Employer kept its employees working at the office regularly, but established safety guidelines based on CDC guidance. Those guidelines included requiring face masks when not in one's office, promoting social distancing, and requiring employees to stay home if sick or exhibiting COVID-19 symptoms. Employer instructed employees experiencing COVID-19 symptoms to get tested and stay home until they received the results. Many employees, including Zerby, routinely kept their office door closed while working.

¶3 Zerby underwent a kidney transplant in 2003 and thereafter took immunosuppressants. Prior to 2020, he was also diagnosed as pre-diabetic. Believing he was at a heightened risk, Zerby was nervous about

2

contracting COVID-19. So Zerby took precautions—wearing a mask, socially distancing, and limiting his amount of time in public.

¶4 On October 7, 2020, Zerby underwent a medical exam and was deemed to be in good health. On October 9, he drove to Colorado by himself, spent the night in a motel, unlocked a storage unit for movers, and drove back to Arizona the following day. Wife testified that Zerby was healthy on return. Zerby returned to work October 12 through 14, but he stayed home October 15 and 16 to move into a new residence. When movers came to assist, Wife directed them while Zerby observed from afar.

¶5 On October 12, a co-worker came to Zerby's office and spoke with him. The co-worker was not wearing a mask, but testimony varied on the length of the conversation—the conversation lasted anywhere from no more than a minute to "[a] few minutes, less than ten minutes probably." A supervisor who officed next door to Zerby believed Zerby's door was open during the conversation, but the co-worker who spoke to Zerby testified they spoke through a closed door. Zerby's chair was positioned six feet from the doorway. The supervisor testified the co-worker was visibly ill and did not feel well. The co-worker called out sick the next two days, October 13 and 14, and took a COVID-19 test, but returned to work on October 15 and 16 before receiving the results. The co-worker eventually received a positive result and informed Employer.

¶6 On October 17, Zerby's supervisor, along with the supervisor's wife and brother, visited Zerby and Wife; the group talked inside and outside Zerby's home. Zerby and Wife then ran a personal errand and were joined by another couple. After, the group had a 90-minute dinner outside at a restaurant. One member of the dinner party who was also Zerby's co-worker tested positive for COVID-19 nearly a week later.

¶7 On October 18, Zerby awoke at night with a fever. The next morning, he felt well enough to go into the office. While there, Zerby texted Wife that he had learned the co-worker who he had spoken to on October 12 had COVID-19 at the time. Wife scheduled Zerby to take a COVID-19 test the following day; the test result came back positive. Zerby's condition deteriorated. On October 23, an emergency room doctor ordered a chest x-ray and recommended that Zerby return to the emergency room immediately for any worsening or new symptoms. Zerby's condition continued to worsen, resulting in his hospitalization on October 27, 2020 and death on November 15, 2020.

¶8    Wife filed a workers' compensation claim, alleging Zerby contracted COVID-19 from a co-worker while working. Employer and its carrier, Cincinnati Insurance Company, denied the claim. Wife requested a hearing with an Administrative Law Judge ("ALJ").

¶9    During the hearing, the ALJ heard conflicting factual and medical testimony about the source of Zerby's infection. Wife's medical expert testified that COVID-19 is a highly contagious respiratory virus transmitted through air droplets or mist exhaled from the mouth. He explained that an individual with COVID-19 is contagious two days before symptoms appear. He opined that the risk of contracting COVID-19 from an infected individual varies based on proximity and length of exposure. He concluded that Zerby likely contracted COVID-19 from an infected co-worker during a conversation on October 12, 2020, and not from the dinner party Zerby attended on October 17. And Zerby's development of symptoms on October 18 was not too attenuated for exposure on October 12 because there is no "evidence that there is a minimum amount of time exposure that is necessary" to contract COVID-19.

¶10    Employer's medical expert testified that, unless there is coughing or sneezing, one requires "about 15 minutes of contact, direct contact with a person, and you need to be fairly close, which [the CDC] say[s] is under six feet," to contract COVID-19. He testified that the infected co-worker was likely contagious on October 12 and Zerby could have been exposed to the virus any time after October 4. Based on what he believed was brief contact between Zerby and the infected co-worker, Employer's expert did not believe Zerby contracted COVID-19 from that co-worker during their conversation.

¶11    The ALJ found in Wife's favor, "determin[ing] that [Zerby] contracted COVID-19 in the course and scope of his employment leading to his death[.]" The ALJ found, based on the fact and medical testimony provided, that Zerby "sustained a sufficient special exposure to COVID-19 [on October 12, 2020] in excess of that of the 'commonalty,'" meaning more than the general populace. Following "a careful review of the testimony of the medical experts," the ALJ concluded that Wife's medical expert testimony "is more probably correct and well-founded where it differs from" Employer's medical testimony. The ALJ found that "Zerby's COVID-19 illness and death arose from and was related to his employment to a reasonable degree of medical probability."

¶12            Employer timely requested special action review.  We have jurisdiction under A.R.S. §§ 12-120.21(A)(2), 23-951(A) and Arizona Rule of Procedure for Special Actions 10.

## DISCUSSION

¶13            When reviewing a worker's compensation award, we defer to the ALJ's factual findings, but review *de novo* questions of law, including whether an injury arose from employment.  *Ibarra v. Indus. Comm'n*, 245 Ariz. 171, 174 ¶ 14 (App. 2018).  We consider the evidence in the light most favorable to sustaining the award.  *Turner v. Indus. Comm'n*, 251 Ariz. 483, 484 ¶ 2 (App. 2021).  We affirm an ALJ's findings if any reasonable theory of the evidence supports them.  *Perry v. Indus. Comm'n*, 112 Ariz. 397, 398–99 (1975).

## I.

¶14            The Arizona Constitution required the legislature to enact a workers' compensation law granting compensation for personal injury or death from any accident arising out of and in the course of employment.  Ariz. Const. art. 18, § 8.  The legislature heeded that command—A.R.S. § 23-1021, for example, entitles qualifying employees to compensation "for loss sustained on the account of . . . injury or death" when injured or killed "by accident arising out of and in the course of his employment."  The legislature further clarified that workers' compensation can be obtained for, as relevant here, "[p]ersonal injury by accident arising out of and in the course of employment" or "[a]n occupational disease" due to causes peculiar to a particular trade but "not the ordinary diseases to which the general public is exposed."  A.R.S. § 23-901(13)(a), (c).  Based on this statutory text, Zerby's COVD-19 infection was not an "occupational disease"—the parties do not assert otherwise.  *See Ford v. Indus. Comm'n*, 145 Ariz. 509, 514 (1985) (explaining that, when the condition at issue is a disease, "either party is entitled to require that the claim be administered" under the occupational disease provisions).

¶15            The legislature has enacted statutory provisions governing workers' compensation claims for specific communicable diseases.  *See* A.R.S. § 23-1043.02 (human immunodeficiency virus); A.R.S. § 23-1043.03 (hepatitis C); A.R.S. § 23-1043.04 (methicillin-resistant staphylococcus aureus, spinal meningitis, tuberculosis).  Yet the legislature has not enacted a statute governing workers' compensation claims for COVID-19, leaving A.R.S. § 23-1021 to supply the governing standard.  Thus, for Wife to obtain compensation, Zerby must have been injured or killed by an "accident

arising out of and in the course of his employment"—the statutory phrase at the crux of this case. *See* A.R.S. § 23-1021. We first address Employer's two legal arguments and then analyze whether the facts of this case support the award.

**A.**

¶16 We start with the word "accident." Employer suggested during oral argument that a disease not qualifying as an "occupational disease" cannot qualify as an "accident." But that argument is inconsistent with decades of precedent saying otherwise.

¶17 In 1943, our supreme court "expanded the normal concept of 'injury by accident' so as to allow compensation under the workmen's compensation laws for disabilities resulting from employment related diseases not specifically listed in the occupational disease statues." *Phx. Pest Control v. Indus. Comm'n*, 134 Ariz. 215, 218–19 (App. 1982). This Court later observed that "an employee contacting a disease may recover compensation as for an injury by accident arising out of and in the course of his employment." *Reilly v. Indus. Comm'n*, 1 Ariz. App. 12, 15 (1965). Simply put, "the terms 'disease' and 'accident' are no longer considered mutually exclusive." *Id.* When an employee develops a disease and the "disease is definitely work-connected," the "disease is the result of an 'accident' within the terms of our Workmen's Compensation Act, and is compensable." *Id.*

¶18 Arizona appellate courts have often affirmed workers' compensation awards for non-occupational diseases. Our supreme court approved compensation when an employee became ill with pneumonia after operating a tractor with a defective exhaust system. *See Dunlap v. Indus. Comm'n*, 90 Ariz. 3, 6–8 (1961). The court commented that "[a]ny disease is compensable under our statute which follows as a natural consequence of any injury which has qualified independently as an accident." *Id.* at 8. This Court has held that Lyme disease, when traced to employment, is compensable despite also concluding "that the occupational disease statutes are inapplicable." *Montgomery v. Indus. Comm'n*, 173 Ariz. 106, 111 (App. 1992); *see also Lorentzen v. Indus. Comm'n*, 164 Ariz. 67, 69 (App. 1990) (holding that allergic reaction can be an "accident" even if not an occupational disease); *Barber v. Indus. Comm'n*, 25

Ariz. App. 486, 489 (1976) (awarding compensation for injuries stemming from hepatitis virus)[1].

¶19      Based on the foregoing, contracting COVID-19—like pneumonia, Lyme disease, allergies, and hepatitis—can constitute an "accident" under the workers' compensation statute, even if COVID-19 does not qualify as an occupational disease. Thus, when an employee develops COVID-19 that is "definitely work connected," COVID-19 "is the result of an 'accident' within the terms of our Workmen's Compensation Act, and is compensable." *Reilly*, 1 Ariz. App. at 15.

**B.**

¶20      Employer's next (and primary) argument is that COVID-19 is not legally compensable because "it is essentially everywhere." Employer relies on a line of cases holding that Valley fever is not compensable. Employer maintains there is a "100-fold incidence of Covid-19 compared to Valley fever, meaning it should be a matter of law that Covid-19 cases also be denied by following the reasoning of our Supreme Court in *Treadway*[.]" Under Employer's view, a workers' compensation claim based on COVID-19 "cannot be maintained as a matter of law due to its widespread presence throughout all parts of the state."

¶21      Employer attempts to stretch the Valley fever decisions too far. Starting in 1950, three appellate decisions—one decision from our supreme court, two decisions from this Court—addressed (and rejected) compensation for Valley fever. *See generally Treadway v. Indus. Comm'n*, 69 Ariz. 301 (1950); *O'Connor v. Indus. Comm'n*, 19 Ariz. App. 43 (1972); *Crawford v. Indus. Comm'n*, 23 Ariz. App. 578 (1975). Each concluded Valley fever was not compensable because the fungal spore causing that disease is present throughout Arizona. Because of that's spore prevalence, it was impossible for the claimant to establish when, where, or how the claimant encountered it—thus, making it impossible to establish that Valley fever was contracted in the course of employment or arose out of employment. *See Treadway*, 69 Ariz. at 308. *Crawford* shut the door on the claim in that case with this explanation: "It is simply not possible to prove that a workman who works out of doors in Arizona . . . contracts valley fever as a result of his work, as opposed to any other time he is exposed to this endemic disease at home, at play, or anywhere else." 23 Ariz. App. at 584.

---

[1] After *Barber*, the legislature enacted A.R.S. § 23-1043.03, which governs workers' compensation claims for hepatitis C.

¶22    Employer is not the first to attempt to extend the Valley fever decisions to cut off compensation for other diseases. But Arizona appellate courts have seldom applied those decisions beyond Valley fever for reasons instructive here. In *Montgomery*, this Court refused to apply the Valley fever trilogy to Lyme disease after "claimant was able to demonstrate that his employment had actually subjected him to an increased risk of contracting the disease." 173 Ariz. at 109. In *Enyart v. Industrial Commission*, this Court distinguished *Treadway* from a case where "the inferences were strongly in favor of a finding that the disease was contracted at the petitioner's place of employment." 10 Ariz. App. 310, 314 (1969). And in *Barber* this Court distinguished *O'Connor* on grounds that the claimant could isolate her potential exposure to the virus causing hepatitis to two exposures while working, and the medical testimony supported that those two exposures were the cause. *See* 25 Ariz. App. at 489.

¶23    We similarly refuse to extend the Valley fever cases to foreclose workers' compensation for COVID-19 infection. *Treadway* and its progeny do not support Employer's argument that a disease is not compensable merely because it is widespread in Arizona. If that were the case, then prior decisions involving other widespread ailments would have turned out differently. *See Barber*, 25 Ariz. App. at 489 (hepatitis); *Dunlap v. Indus. Comm'n*, 90 Ariz. at 6–8 (pneumonia); *Lorentzen*, 164 Ariz. at 69 (allergies); *McCreary v. Indus. Comm'n*, 172 Ariz. 137, 144–45 (1992) (allergies). The Valley fever cases involved a unique situation where it was impossible, even with medical expert testimony, to establish when, where, and how a claimant contracted a disease present in the general environment, and it is only then that the Valley fever cases automatically eliminate compensation. *Cf. Treadway*, 69 Ariz. at 304 ("[T]o constitute an 'accident' [a disease] must be traceable to a definite time and place [that is connected to employment].").

¶24    Unlike the spores causing Valley fever, COVID-19 can be transmitted "from person to person." *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020). As a virus capable of person-to-person transmission, COVID-19 is capable of being traced from person-to-person. Indeed, person-to-person tracing was one method governments tried out to mitigate the COVID-19 pandemic. *See Parker v. Governor of Pa.*, 2021 WL 5492803, at *1 (3d Cir. Nov. 23, 2021) (describing Pennsylvania's contact tracing program). With person-to-person tracing possible, a workers' compensation claimant will occasionally be able to trace exposure to COVID-19 to the workplace. When the evidence supports that COVID-19 was actually contracted at a claimant's place of employment during work hours while on duty, and the other statutory requirements are met, we see

no reason to treat COVID-19 differently than any other compensable communicable disease.

## II.

**¶25**        We, therefore, next determine whether Wife met the statutory requirements by establishing that Zerby's COVID-19 infection arose out and in the course of his employment. *See* A.R.S. § 23-1021. The "arising out of" and "in the course of" requirements are not independent; both are part of a single test of work connection known as the "quantum theory" of work connection. *Noble v. Indus. Comm'n*, 188 Ariz. 48, 50, 52–53 (App. 1996). Under that theory, "the strength of one element may counterbalance the weakness of the other to yield a compensable claim." *Id.* at 50; *see also* 1A Arthur Larson, The Law of Workmen's Compensation § 29.10 (1996) (discussing "quantum theory"). We agree with the ALJ that Zerby's injury arose out of and in the course of employment.

## A.

**¶26**        The inquiry regarding whether an injury was sustained "in the course of" employment focuses on the time, place, and circumstances under which it occurred. *Royall v. Indus. Comm'n*, 106 Ariz. 346, 349 (1970). An injury occurs in the course of employment if the employee was injured when he or she was doing what the employee "may reasonably do within a time during which [the employee] is employed and at a place where [the employee] may reasonably be during that time." *Id.* (citation omitted).

**¶27**        The ALJ heard conflicting factual testimony about the nature of Zerby's conversation with an infected co-worker on October 12, 2020. The ALJ also heard conflicting medical expert testimony about whether that interaction was sufficient for COVID-19 to be transmitted from the infected co-worker to Zerby. After considering that testimony and determining the respective credibility of the witnesses, the ALJ made a factual finding that Zerby contracted COVID-19 during that conversation. Reasonable evidence supports that finding—particularly when the evidence is considered in the light most favorable to sustaining the award. *See Turner*, 251 Ariz. at 484 ¶ 2. Because it is uncontested that Zerby was in his office working for Employer when the October 12 conversation occurred, the ALJ correctly concluded that Zerby contracted COVID-19 in the course of his employment.

**B.**

¶28    That leaves one last issue: whether Zerby's death from COVID-19 arose out of his employment. Employer argues Wife did not satisfy the "arising out of" requirement because she "did not present evidence that [Zerby's] workplace exposure to COVID-19 exceeded that of the general population" or "arose from the nature of his work." Wife responds that Zerby's injuries from COVID-19 arose out of his employment because his only known exposure can be traced to the workplace while Zerby was acting in the course of employment. The ALJ found, based on the conflicting testimony presented, that Zerby "sustained a sufficient special exposure to COVID-19 [on October 12, 2020] in excess of that of the 'commonalty.'" We agree that Wife met the "arising out of" requirement.

¶29    To arise out of employment, an injury must result from some risk of the employment or be incidental to the discharge of the duties thereof. *Royall*, 106 Ariz. at 349. We analyze both the origin and nature of the risk involved. As to the origin of the risk, we consider whether the origin is:

(1) Distinctly work related, such as machinery malfunctioning or dynamite exploding;

(2) Wholly personal, such as a heart attack entirely attributable to a preexisting heart condition or a death from natural causes;

(3) Mixed, i.e., partially work related and partially personal; or

(4) Neutral, such as being hit by a stray bullet or struck by lightning.

*See Royall*, 106 Ariz. at 350; *see also P.F. Chang's v. Indus. Comm'n*, 216 Ariz. 344, 347–48 ¶¶ 15–16 (App. 2007).

¶30    As to the nature of the risk, we place the risk contributed by employment into one of the four following categories:

(1) The peculiar risk doctrine—the source of the injury is peculiar to the occupation;

(2) The increased risk doctrine—the employment quantitatively increases the chance of injury;

(3) The actual risk doctrine — the employment subjects the employee to the risk of this injury; or

(4) The positional risk doctrine — the injury would not have occurred but for the fact that the employment placed the employee in a position where he was injured.

*Martinez v. Indus. Comm'n*, 192 Ariz. 176, 180 ¶ 18 (1998) (citing 1A Arthur Larson, The Law of Workman's Compensation § 6 (1998)).

**¶31**       Here, Employer's causation argument is premised on the "increased risk doctrine" — Employer maintains Wife cannot recover because Zerby's risk of contracting COVID-19 at work was no higher than at any other time or place. But that view of causation is too narrowly focused and ignores the existence of mixed risk cases "in which a personal cause and an employment cause combine to produce the harm." *Martinez*, 192 Ariz. at 180 ¶ 19. In *Martinez*, our supreme court gave the following example of a mixed risk case: "[A] person with a weak heart dies or is disabled from occupational stress." *Id.* In that situation, one could argue that an employee's risk from "occupational stress" was no higher than the employee's risk from "personal stress," and thus the employee cannot recover. But this Court has rejected that view of causation in mixed risk cases: "It is not necessary to show that the risk of injury from the work-related activity was greater than the risk of injury in nonemployment activities." *Samaritan Health Servs. v. Indus. Comm'n*, 170 Ariz. 287, 292 (App. 1991).

**¶32**       And, in mixed risk cases, Arizona courts have repeatedly affirmed workers' compensation awards when employment was merely a contributing factor to an injury, without analyzing whether the employee faced a similar risk outside of the worksite. *See id.* at 180 ¶ 21 (confirming eligibility for award when "claimant's writing activity at work contributed to the degeneration of her wrist condition"); *Samaritan*, 170 Ariz. at 292 (affirming compensation when bending activity at work operated on a pre-existing knee condition to cause a second injury); *Division of Vocational Rehab. v. Industrial Comm'n*, 125 Ariz. 585 (App. 1980) (finding sufficient causation where a welder's work-related bending activity contributed to a back injury).

**¶33**       This is a mixed risk case. Zerby's risk of work-related exposure from interacting with potentially infected co-workers in person combined with his underlying medical condition (he was pre-diabetic and immuno-compromised after a kidney transplant) resulted — legally and

11

medically—in his death from COVID-19.  In a mixed risk case, we employ the actual risk doctrine (not the increased risk doctrine Employer urges).  *See Samaritan*, 170 Ariz. at 292 ("[T]he actual risk test applies to determine whether an injury arises out of employment where a work-related activity and a personal condition combine to cause an injury.").  We do "not weigh the relative importance of the personal and employment causes, nor [do we] look for primary and secondary causes; [we] merely inquire[] whether the employment was a contributing factor."  *Martinez*, 192 Ariz. at 180 ¶ 20.

¶34        Here, as explained, the evidence reasonably supports the ALJ's finding that Zerby contracted COVID-19 from an infected co-worker while in the office and on duty.  Testimony also supports the ALJ's observation that Zerby's employment required him to "have contact with project managers such as [the infected co-worker] from time to time."  The record does not adequately support that Zerby was exposed outside of work to any individual infected with COVID-19 during the relevant time when he could have become infected.  According to Wife's medical expert, Zerby's death certificate listed his immediate cause of death as COVID-19 pneumonia and his secondary causes as renal transplant recipient, diabetes mellitus, and hypertension.  The record, thus, supports that Zerby's work activity resulted in COVID-19, which then combined with Zerby's preexisting conditions to cause his death.  Zerby's employment was a contributing factor to his death, satisfying the "arising out of" requirement in this mixed risk case.  *See McCreary*, 172 Ariz. at 144 (declaring a claim compensable where "work activity combines with a preexisting condition to cause a further injurious result"); *Lorentzen*, 164 Ariz. at 69 ("[I]f the industrial injury operates on an existing weakness to produce further injurious results, industrial injury causes that result.").

**CONCLUSION**

¶35        We affirm the award.



AMY M. WOOD • Clerk of the Court
FILED:    AA